**Emily SCHMIDT, Marie Farrenkoff, Margaret O'Leary and James Kelly, individually and as representatives of the classes herein described**

v.

**The BOSTON HOUSING AUTHORITY; Barbara A. Carpenter, in her capacity as Chairperson of The Boston Housing Authority; John J. Battas, in his capacity as Treasurer of The Boston Housing Authority; O. Philip Snowden, in his capacity as Commissioner of The Boston Housing Authority; Patrick B. Mascaritalo, in his capacity as Commissioner of The Boston Housing Authority; John F. Murphy, in his capacity as Director of Occupancy of the Boston Housing Authority.**

Civ. A. No. 79–917–Z.

United States District Court,
D. Massachusetts.

Jan. 20, 1981.

Robert Sprei and Robert Dinsmore, Boston, Mass., for plaintiffs.

Paul M. Yee and George F. Mahoney, Boston Housing Authority Legal Dept., Boston, Mass., for defendants.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

Plaintiffs in this action have brought suit alleging that defendants have violated the Civil Rights Act of 1871, 42 U.S.C. § 1983; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d; Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3604(b) and (d) as well as the Fourteenth and First Amendments to the United States Constitution. They sue on behalf of four classes of white life-long residents of South Boston who claim to be injured as a result of the Tenant Selection and Assignment Plan (hereinafter the Plan) adopted by the Boston Housing Authority (BHA) to select tenants for public housing. Class One consists of white elderly residents of South Boston who are applicants for low income housing; Class Two of white applicants for low income housing who are residents of South Boston; Class Three of white tenants who reside in low income housing in South Boston and have applied for transfer to low income housing in that community; and Class Four of leaders of the South Boston community. The defendants, Carpenter, Battas, Snowden, Mascaritalo and Murphy are sued in their official capacity as Chairperson, Treasurer, Commissioners, and Director of Occupancy of the Boston Housing Authority respectively. The defendant BHA is a public corporation created under Chapter 121B, Section 3 of the Massachusetts General Laws and authorized to select tenants pursuant to Section 32 of that chapter.

Plaintiffs allege that the Plan adopted by the BHA in 1977 and implemented in 1978 as the criterion for selecting applicants for low income housing units owned or leased by the BHA and for granting transfers to

tenants of such units, has operated to deprive plaintiffs in Classes One, Two, and Three of the opportunity to rent or secure transfers to low income housing in the South Boston area because they are white and are not considered "minority preference applicants". As a consequence plaintiffs allege that they are being given the choice between moving from a neighborhood in which they have developed life-long ties while accepting housing in neighborhoods that are hostile to them, and forefeiting their place on the waiting list for low income housing. They allege that this violates their constitutional and statutory rights.

As a result of the operation of the Plan on the members of Classes One, Two and Three, the members of Class Four allege that they would be deprived of the companionship and association provided by the members of Classes One, Two, and Three in violation of their First Amendment rights.

Plaintiffs seek a declaration that the Plan is unconstitutional on its face and as applied to plaintiffs and all members of their respective classes and violates federal law; an injunction restraining these defendants from using the Plan to select applicants and transfers for low income housing in the City of Boston; an injunction restraining defendants from denying units to persons prejudiced by the enforcement of the Plan; and damages for the members of Classes One, Two, and Three for injury caused by the use of the Plan by the defendants, their agents or servants, in selecting applicants or transfers. This matter is before this Court on defendants' motion to dismiss or in the alternative for summary judgment.

The background of this litigation is provided by a state court action entitled *Armando Perez, et al. v. BHA*, Suffolk Superior Court No. 17222, filed in February 1975 by tenants of the BHA on behalf of themselves and others similarly situated in which the plaintiffs sought to correct alleged widespread violations of the State Sanitary Code in the housing developments owned or operated by the BHA. Pursuant to a state court finding of racial segregation in BHA's developments, Judge Paul Garrity of the Superior Court ordered the BHA in December of 1975 to collect data concerning the racial composition of its developments and its waiting lists; to propose revisions to its policies and procedures concerning tenant selection, assignment, and transfers to achieve a reduction of racial segregation; to develop a plan for desegregation of its developments; and to take interim steps to maintain racial balance in developments where there was a substantial racial mix and make assignments to all other developments by providing preference to applicants who would improve the racial balance of a development.

On June 1, 1977 Judge Garrity approved a consent decree, elements of which set forth the BHA's obligation to submit to the U. S. Department of Housing and Urban Development (HUD) and the state's Department of Community Affairs (DCA) a completed Tenant Selection, Assignment and Transfer Plan that had been developed pursuant to Judge Garrity's order. The Plan was subsequently submitted and approved by HUD and DCA and was implemented by BHA in June 1978. In July 1979 Judge Garrity vacated the consent decree and placed the BHA into receivership. However, the order of July 1979 directed the BHA to continue to implement the Plan.

In 1975 HUD had conducted a compliance investigation of the BHA and made a finding of violation of Title VI and HUD regulations. A compliance agreement was entered into by the BHA and HUD in November, 1977 in which the BHA agreed, among other terms, to process applications of all persons for occupancy of any dwelling unit owned or managed by the BHA in accordance with the Plan.

Essentially the Plan establishes a system of priorities for tenant assignment and selection. It accords priority to those applicants and transfer applicants who choose to be housed at a BHA development in which their race is substantially in the minority. A racial group is considered to be substantially in the minority if the percentage of

tenants of that race living in one development is less than that racial group's percentage of the total number of people eligible for public housing in the City of Boston. However, white applicants are not eligible for this priority if the percentage of white tenants in a development is fifty percent or greater. Thus non-white applicants are deemed to be minority preference applicants for predominately white developments while white applicants are given priority for those developments which are predominately non-white.

Under the Plan when an applicant or transfer applicant is offered an apartment that applicant must accept within one week. If the applicant does not accept within that period his or her name is withdrawn from the waiting list unless a showing of unusual hardship is made (e. g. physical incapacity or financial hardship). The applicant may then choose to re-apply for public housing at which time his/her application will be placed at the bottom of the waiting list. The minority preference priority thus may increase the time on the waiting list for all those applicants and transfer applicants who do not choose to be minority preference applicants. As such it operates as a freedom of choice plan, providing incentives to act as a minority preference applicant without compelling such action.

Defendants contend that plaintiffs are precluded from suit under Title VI of the Civil Rights Act of 1964 because no private right of action exists for a Title VI violation. Regardless of whether such a private right of action exists defendant asserts that plaintiffs have failed to state a claim for relief under Title VI, § 1983, and the Fourteenth Amendment to the United States Constitution for failure to allege discriminatory intent. Additionally defendants contend that on the pleadings, the affidavits and the Plan itself there are no facts upon which this Court could make a finding of discriminatory effect necessary for a Title VIII violation and thus entry of summary judgment for defendants is appropriate. They further assert that plaintiffs have failed to state a First Amendment claim because no freedom of association, assembly and privacy rights have even arguably been infringed by the operation of the Plan.

I. Title VI (42 U.S.C. § 2000d), State Action (42 U.S.C. § 1983), and 14th Amendment Claims

A. Private Right of Action Under Title VI

Title VI of the Civil Rights Act of 1964, § 2000d provides that:

[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The Supreme Court has not yet decided whether a private right of action exists under Title VI. In *Regents of University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) the Court left the question open (4 Justices explicitly finding a private right of action; 4 Justices assuming without deciding; 1 Justice finding no private right of action). However, in the more recent decision of *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) the Court strongly implied in dictum that a private right of action exists under Title VI and found a private right of action under Title IX, a statutory program "patterned after Title VI..." *Cannon v. University of Chicago*, 99 S.Ct. at 1956. Hence for the purposes of defendants' motion to dismiss I will assume that a private right of action may be implied under Title VI.

B. Discriminatory Intent

█ Recent Supreme Court decisions have made it clear that a racially disproportionate impact alone will not suffice to render official action unconstitutional. Proof of a racially discriminatory intent is required to hold such official acts violative of the Equal Protection Clause, *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Develop-*

*ment,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) and of 42 U.S.C. § 1983. Since Title VI proscribes only those racial classifications which would violate the Equal Protection Clause, *Regents of University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) proof of intent to discriminate is also necessary to make out a Title VI violation. *Resident Advisory Board v. Rizzo,* 425 F.Supp. 987 (D.C.Pa. 1976), stay denied 429 F.Supp. 222, modified 564 F.2d 126 (3d Cir. 1977), *cert. denied* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Gautreaux v. Chicago Housing Authority,* 265 F.Supp. 582 (D.Ill.1967), aff'd 436 F.2d 306 (7th Cir. 1970), *cert. denied* 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971). While *Washington v. Davis* does not require a plaintiff to prove that the challenged action rested solely upon a racially discriminatory purpose, such a purpose must have been a motivating factor in the decision.

▮ In inquiring into the purpose of official action courts must be sensitive to indirect and circumstantial evidence of intent to discriminate. Particularly in light of the increasingly harsh censure to which individuals are subject for racially discriminatory statements, the guarantees of the equal protection clause would be worth little if courts could not inquire into various indirect measures of intent. Under the *Arlington Heights* criteria an "invidious discriminatory purpose" can be gleaned from a consideration of the following factors: the discriminatory impact of the decision; the historical background of the attacked decision; the sequence of events leading up to the challenged action; departure from normal procedural sequences which may afford evidence of improper purpose and departure from normal substantive considerations. *Arlington Heights,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

▮ In the circumstances of this case, assuming that these criteria apply equally to the affirmative action context, it is clear that there are no facts which would be sufficient to sustain a finding of an invidious purpose to discriminate against whites when measured against any of these factors. The historical background out of which the Plan arose was the on-going state court litigation. The Plan was admittedly formulated in response to a state court order requiring the BHA to remedy the effects of segregation. There is no allegation that the officials involved in formulating the Plan were motivated in any way by a desire to discriminate against whites. The procedures involved in formulating the Plan were closely regulated by the state court and the Plan itself was subject to thorough Court review. Plaintiffs do not allege that there were any departures from the normal procedural sequences involved in obtaining approval for and implementing the Plan. The series of events leading up to the implementation of the Plan in fact complied with the procedures set forth in the consent decree. The Plan was approved by the state's Department of Community Affairs and by HUD and was acceptable to HUD for compliance under Title VI. In addition, as discussed below in Part II of this opinion, the Plan has had no discriminatory impact as applied.

Thus the allegations in the complaint along with the affidavits submitted by both sides present the very paradigm from which to deduce lack of discriminatory intent on the part of the defendants. Consequently the plaintiffs have failed to make out a claim for relief under Title VI of the Civil Rights Act of 1964, (42 U.S.C. § 2000d), § 1983 of the Civil Rights Act of 1871, (42 U.S.C. § 1983) and the Equal Protection Clause of the Fourteenth Amendment to the Constitution. Defendants' motion for summary judgment with respect to Counts II, III, IV and VI of the amended complaint is accordingly allowed.

## II. Title VIII (42 U.S.C. §§ 3604(b) and (d))

### A. Discriminatory Intent

▮ The Fair Housing Act, (Title VIII of the Civil Rights Act of 1968) was enacted in 1968 to prohibit a wide variety of discriminatory housing practices ranging from a

discriminatory refusal to rent or sell on the basis of race to discrimination in the terms and conditions of housing. The legislative history of the Act reveals that in enacting this legislation Congress was attempting to remedy its past failures in ending racial discrimination in housing by espousing the concept of affirmative action. 114 Cong. Rec. 2277, 2281. *Resident Advisory Board v. Rizzo*, 425 F.Supp. 987 (D.Pa.1976), stay denied 429 F.Supp. 222, modified 564 F.2d 126 (3d Cir. 1977), *cert. denied* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978).

In recent years Title VIII has become a more popular remedy for those seeking to end discrimination in housing given the increased burden of proof placed upon equal protection claimants by *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). Various courts have concluded that proof of discriminatory purpose is not necessary to establish a Title VIII violation. Rather the plaintiffs need only prove that the challenged action had a discriminatory effect to establish a prima facie violation of Title VIII. *Metropolitan Housing Development v. Village of Arlington Heights*, 558 F.2d 1283 (7th Cir. 1977) (*Arlington Heights II*); *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977), *cert. denied* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Smith v. Anchor Bldg. Corp.*, 536 F.2d 231 (8th Cir. 1977); *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir. 1974), *cert. denied* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *Banks v. Perk*, 341 F.Supp. 1175 (D.Ohio 1972), aff'd in part, rev'd in part, 473 F.2d 910 (6th Cir. 1973).

 While the Court of Appeals for the First Circuit has not yet ruled on this question I am persuaded that discriminatory intent must not be proven to make out such a violation. The Supreme Court has noted that Title VIII should be construed broadly so as to end discrimination. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). In the *Arlington Heights* litigation, the lower courts had concluded that only discriminatory effect had been proven. In remanding to the Seventh Circuit for a finding as to Title VIII violations after concluding that no equal protection claim existed for failure to prove discriminatory intent, the Supreme Court implied that a discriminatory effect alone would suffice for Title VIII purposes. Both the Seventh and the Third Circuits have adopted this interpretation of the Supreme Court's action. *Arlington Heights II*, 558 F.2d 1283 (7th Cir. 1977); *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978).

The legislative history of the Act reveals that in adopting this legislation an amendment introduced by Senator Baker which would have required a showing of intent to establish a Title VIII violation was rejected by Congress. 114 Cong.Rec. 5221–22 (1968). Congress was clearly concerned with problems of proof. Senator Percy stated that if "racial preference" was to be an element of the new Act, "proof would be impossible to produce." *Id.* at 5216, quoted at 564 F.2d at 147. To require allegations of discriminatory intent would be to necessitate a subsequent evidentiary showing commensurate with an equal protection violation which in view of the difficulties of establishing intent, would in effect, enable much racial discrimination in housing to go unpunished. As the Seventh Circuit has stated "We cannot agree that Congress in enacting the Fair Housing Act intended to permit municipalities to systematically deprive minorities of housing opportunities simply because those municipalities act discreetly." *Arlington Heights II*, 558 F.2d 1283, 1290 (7th Cir. 1977).

Accordingly, I conclude that to withstand a motion to dismiss plaintiffs must allege discriminatory effect only.

B. Discriminatory Effect of the Plan

 An examination of the pleadings, the Plan itself and the affidavits filed by both sides shows that there are no facts from which a finding of discriminatory effect could be made. The Sections of the

Act upon which plaintiffs rely make it unlawful

 (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin. 42 U.S.C. § 3604(b) (1968).

 (d) To represent to any person because of race, color, religion, sex or national origin that any dwelling is not available for inspection, sale or rental when such dwelling is in fact so available. 42 U.S.C. § 3604(d) (1968).

The Plan is clearly facially neutral. Both white and non-white persons can be classified as "minority preference applicants" depending upon the particular housing development chosen. Section V(B)(5)(c) of the Plan defines minority preference applicant as follows:

 Any applicant who chooses to be housed at a development in which his/her race (white, black, American Indian, Spanish/speaking, Oriental, Other (Eskimos, Aleutians) is substantially in the minority will be given priority over all other applicants in the first available habitable vacancy of suitable size at the development selected, except that white applicants will not be eligible for this priority once the percentage of white tenants in a development reaches fifty percent (50%). A racial group is a substantial minority when the percentage of tenants of that race living in one development is less than that racial group's percentage of the total number of people eligible for public housing in the City of Boston. . . .

Section V(b)(5)(d) provides the definition of minority preference transfer as follows:

 Any tenant in resident at an Authority development in which his/her race is not substantially in the minority will have the right to apply for a transfer to a location at which his/her race is substantially in the minority, and will receive priority over all other transferees and applicants, except for emergency applicants or transferees, for available vacancies at the project chosen. However, white applicants will not be eligible for this priority once the percentage of white tenants in a development reaches fifty percent.

Thus according to the definitions set forth in the Plan whites can benefit from minority preference status on an equal basis with minorities.

The statistics provided in an appendix to plaintiffs' complaint reveal that the Plan as applied has no discriminatory effect. While non-whites are considered as minority preference applicants for twenty-eight housing developments and programs, whites are considered as minority preference applicants for twenty-three housing developments and programs. The difference is legally insignificant.

In addition, every applicant or transferee is given the opportunity under the Plan to apply for and select the development of his or her choice. Section III(B)(4) provides that applicants shall be asked to name up to three preferred locations for housing from among all BHA housing developments or leased housing. The applicant will only be offered housing in one of the developments that he himself selected. As such the Plan involves complete self selection in that applicants themselves determine whether or not to elect minority preference status. Thus it establishes a true freedom of choice system.

All of the housing developments in South Boston are "racially imbalanced", defined as less than ten percent non-white. Consequently whites are not given the opportunity to act as "minority preference applicants" for BHA housing developments located in South Boston. This appears to be the gravamen of plaintiffs' complaint. However, there is no federally protected right to housing in a particular community, an allegation which lies at the essence of plaintiffs' action. Nor may plaintiffs attempt to keep members of another racial group from entering the community. *Railway Mail Association v. Corsi*, 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945). Plaintiffs are not prevented from obtaining all

housing in the South Boston community as a result of the operation of the Plan. And clearly there is no federally protected right to low income public housing. *Acevedo v. Nassau County*, 500 F.2d 1078 (2d Cir. 1974). Discriminatory effect cannot be established with reference to a single community.

## C. Affirmative Duty

In ruling on defendants' motion for summary judgment I am necessarily guided by the Congressional purpose in fashioning the Fair Housing Act. In enacting that statute, Congress was responding to a perceived failure of prior legislation to bring about desegregation in housing.*

In order to respond to such governmental inaction Congress enacted § 3608(d)(5) of the Fair Housing Act which states:

(d) The Secretary of Housing and Urban development shall

&ast; &ast; &ast; &ast; &ast; &ast;

(5) Administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter. (42 U.S.C. § 3608(d)(5)).

The First Circuit has recognized this as an affirmative action requirement in the area of racial discrimination. *Silva v. East Providence Housing Authority*, 565 F.2d 1217 (1st Cir. 1977) (dictum). In *Otero v. New York City Housing Authority*, 484

F.2d 1122 (2d Cir. 1973) the Second Circuit read this section as imposing an affirmative duty on local housing authorities to integrate stating that an authority is "barred from using assignment methods which seek to exclude ... persons of minority races from residing in predominately white areas or of restricting non-whites to areas already concentrated by non-white residents." 484 F.2d at 1133. The Court held that not only may such practices be enjoined, but affirmative action to erase the effects of past discrimination and desegregate housing patterns may be ordered. And the Court noted that Senator Mondale, one of the proponents of the Act, stated that the proposed law was designed to replace urban ghettos with "truly integrated and balanced living patterns." 114 Cong.Record 3422.

Similarly in *Shannon v. United States Department of Housing and Urban Development*, 436 F.2d 809 (3d Cir. 1970) the Third Circuit held that color-blindness in national housing policy was impermissible and noted that "increase or maintenance of racial concentration is prima facie likely to lead to urban blight and is thus prima facie at variance with the national housing policy" 436 F.2d at 821. The Court outlined a progression in the thinking of Congress from the Housing Act of 1949 in which HUD "could not act unconstitutionally, but possibly could act neutrally on the issue of racial segregation" to the Civil Rights Act

---

* Senator Brooke, in referring to the Civil Rights Act of 1964 stated:

> Rarely does HUD withhold funds or defer action in the name of desegregation. In fact, if it were not for all the printed guidelines the housing agencies have issued since 1964, one would scarcely know a Civil Rights Act had been passed.
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> What adds to the murk is officialdom's apparent belief in its own sincerity. Today's Federal housing official commonly inveighs against the evils of ghetto life even as he pushes buttons that ratify their triumph— even as he ok's public housing sites in the heart of Negro slums, releases planning and urban renewal funds to cities dead-set against integration, and approves the financing of suburban subdivisions from which Negroes will be barred. These and similar acts are committed daily by officials who say they

are unalterably opposed to segregation, and have memos to prove it.

> ... But when you ask one of these gentlemen why, despite the 1962 fair housing Order most public housing is still segregated, he invariably blames it on regional custom, local traditions, personal prejudices of municipal housing officials. 114 Cong.Record 2527–28; 2281.

Senator Mondale also dealt with the issue of desegregation. He stated:

> Negroes who live in slum ghettos, however, have been unable to move to suburban communities and other exclusively White areas. In part, this inability stems from a refusal by suburbs and other communities to accept low-income housing.... An important factor contributing to exclusion of Negroes from such areas, moreover, has been the policies and practices of agencies of government at all levels. 114 Cong.Record 2277.

of 1964 in which prevention of discrimination was required, and finally to the Civil Rights Act of 1968 in which the Secretary was directed to act affirmatively to promote fair housing. 436 F.2d at 816.

Other courts have interpreted Title VIII to impose upon HUD an affirmative duty to eliminate discrimination in housing. *Banks v. Perk*, 341 F.Supp. 1175 (D.Ohio 1972), aff'd in part, rev'd. in part 473 F.2d 910 (6th Cir. 1973); *Gautreaux v. Chicago Housing Authority*, 265 F.Supp. 582 (D.Ill.), aff'd. 436 F.2d 306 (7th Cir. 1970), *cert. denied* 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971); *Hicks v. Weaver*, 302 F.Supp. 619 (E.D.La.1969). While some courts have imposed this duty upon local housing authorities as well, *Otero v. New York City Housing Authority*, 484 F.2d 1122 (2d Cir. 1973); *Banks v. Perk*, 341 F.Supp. 1175 (D.Ohio 1972), aff'd in part, rev'd in part, 473 F.2d 910 (6th Cir. 1973), the First Circuit has not decided nor do I decide here whether such a duty applies to local governmental entities nor whether such a duty is judicially enforceable. I merely view this section of the Act as further evidence of a Congressional purpose to encourage affirmative action programs which serve to remedy the effects of past racial segregation.

In view of the national policy expressed in Title VIII in favor of affirmative action plans exemplified by the Plan, and particularly in view of the inability of plaintiffs to demonstrate discriminatory effect, I conclude that there is no genuine issue of material fact concerning plaintiffs' allegations of discriminatory effect. Defendants' motion for summary judgment is, therefore, allowed with respect to Count V of the complaint.

### III. First Amendment Claims

In Count I of their complaint plaintiffs allege that the Plan on its face and as applied violates the First Amendment to the Constitution in that it creates a chilling effect upon plaintiffs' exercise of their rights to freedom of association and assembly and infringes upon their right to privacy.

Clearly the Constitution recognizes a right to freedom of association for individuals to further their personal beliefs which right is encompassed by the freedom of speech, assembly and petition. *Healy v. James*, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972). The right of privacy has been recognized as implicit in various amendments to the Constitution including the ninth amendment. *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). However, none of these rights have been even arguably infringed by the existence or the operation of the Plan.

In no way have plaintiffs been or will they in the future be prevented from associating or assembling by the operation of the Plan. Given the fact that the Plan operates on a freedom of choice basis plaintiffs are free to remain in the South Boston community. In fact according to the averments in the complaint all of the plaintiffs are at present residents of the South Boston community and have not been prevented from assembling or associating as a result of the Plan.

Furthermore and more fundamentally, the South Boston community is not and cannot be regarded as an association. It is merely a location within the City of Boston. Any interpretation of the freedom to associate which included such a definition would do violence to the spirit of the First Amendment by creating a right among established residents of a community to remain there. Clearly such was not the intent of the Framers.

Finally, plaintiffs have failed to show how their right to privacy has been infringed by the operation of the Plan. Government programs are a fact of life within which all citizens must operate and to claim that such a program infringes upon the privacy rights of some merely by providing incentives to reside in a particular location would have far-reaching implications beyond the bounds of this action. This claim is frivolous and defendants' motion for summary judgment with respect to Count I of the complaint is granted.

In summary, defendants' motion for summary judgment is granted with respect to Counts I through VI of the complaint. Judgment may be entered accordingly.