Betty **ANDERSON, et al., Plaintiff,**

and

**NAACP, Intervening,
Plaintiff-Appellant,**

v.

**CITY OF ALPHARETTA, et al.,
Defendants-Appellees.**

**No. 85–8158
Non-Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

Sept. 17, 1985.

---

**1576**

Donald P. Edwards, Atlanta, Ga., for intervening, plaintiff-appellant.

D. William Garrett, Jr., Gary J. Markwell, Alpharetta, Ga., for defendants-appellees.

Before TJOFLAT, HILL and ANDERSON, Circuit Judges.

PER CURIAM:

This appeal was brought initially by Janice Cook, Gloria Cook, and Mary Cook, plaintiffs below, and the National Association for the Advancement of Colored People, Inc. (NAACP), as intervening plaintiff. On their application for an order dismissing the appeal as to them, the court has dismissed the Cooks from the case. This leaves the NAACP as the sole remaining appellant.

The district court dismissed the NAACP from the case because it lacked standing, both in its corporate and representative capacities, to bring the claims it alleged. We AFFIRM the dismissal for the reasons stated by the district court in its dispositive order, annexed as Exhibit A.

## EXHIBIT A

### ORDER

This public housing suit against the City of Alpharetta was filed on March 13, 1981. Almost four years later, the City of Alpharetta was finally apprised of the names of individuals who were allegedly injured by the city's actions. At that point, all discovery was long ended, and trial was scheduled for the next month.

The City of Alpharetta would be more accurately described as a town. Located approximately 25 miles north of downtown Atlanta, Alpharetta covered 18.2 square miles and had a population of 3,128 in 1980. Alpharetta, as well as Roswell and Sandy Springs, is located in the unincorporated area of Fulton County. Fulton County, which also includes the City of Atlanta, covered 534 square miles and had a population of 589,904 in 1980.[1]

In January 1979, the Fulton County Housing Authority designated four proposed sites for public housing including a site in unincorporated Fulton County contiguous to the City of Alpharetta. This property, referred to by the parties as the Hopewell Road site, was owned by Economic Homes, Inc., whose president and chief stockholder was Bill Dickerson. In February 1979, the Fulton County land agent and Dickerson discussed purchase of the Hopewell Road site.

In March 1979, public opposition to low-income housing on the Hopewell Road site grew. A citizen's committee was formed; a petition was circulated; and a survey of

1. The population of Alpharetta, the population of Fulton County, and the size of Fulton County are based on 1980 census figures. The size of Alpharetta was stipulated, upon court request, by the attorneys for the city defendants and for the plaintiffs, other than the NAACP. The stipulated figure was based on a calculation made for the 1980 census.

Alpharetta residents at a local shopping center was conducted.

Almost a year later, in February 1980, the land agent for Fulton County sent a letter expressing renewed interest in the property. Dickerson responded on March 6, 1980, setting his price at $105,000 and requiring that the sale close before April 30, 1980. On April 3, 1980, the Fulton County Housing Authority informed Dickerson that HUD had tentatively approved the site and that a member of an architectural firm would contact Dickerson shortly.

On July 14, 1980, Dickerson received a letter from H. Ray McPhail, who with H. Stanley Windham had previously purchased an adjoining 10-acre tract from Dickerson for a shopping center development. McPhail offered $72,000 for the Hopewell Road site. Following negotiation of other aspects of the sale, Dickerson accepted that figure. On July 30, 1980, when the Fulton County Housing Authority finally made an offer of $50,000 for the site, the owner had already entered into a contract of sale with the commercial developers.

On August 22, 1980, Dickerson conveyed the site to McPhail who, in turn, conveyed a one-half interest to Windham, and on September 16, 1980, the property was annexed into the City of Alpharetta and zoned for commercial use. The annexation effectively precluded the Fulton County Housing Authority from developing the site without the city's consent. *See* O.C.G.A. § 8-3-110.

The complaint charges that the City of Alpharetta acted with racially discriminatory purpose and effect to block the placement of public housing on the Hopewell Road site. More specifically, the complaint alleges that city officials organized the citizens group, encouraged the sale to McPhail and Windham, and improperly annexed and rezoned the property. The complaint seeks an injunction affirmatively to require the City of Alpharetta to provide public housing within its borders for 50 low-income families and negatively to restrain the city from unreasonably disapproving or interfering with the development of low-income housing. Requests for damages in the original complaint were later withdrawn.

There is no constitutional guarantee of access to a dwelling of particular quality, *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972), and the defendant city had no constitutional or statutory duty to provide such low-income housing. *Acevedo v. Nassau County*, 500 F.2d 1078, 1080–81 (2d Cir.1974); *Schmidt v. Boston Housing Authority*, 505 F.Supp. 988 (D.Mass.1981). However, the city could not interfere with the development of public housing on the Hopewell Road site if it acted with racially discriminatory intent. *Schmidt*, 505 F.Supp. at 992–93.

Attorneys for the plaintiffs argue that there is circumstantial evidence of Alpharetta's discriminatory intent under the test set out by the Supreme Court in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The attorneys point to procedural and substantive aberrations in the city's annexation of the Hopewell Road site, including the following: (1) the city's guaranteeing commercial zoning of the property for five years although the city had previously opposed such zoning for adjacent property, although no other property in Alpharetta other than the downtown business district was zoned for commercial use, and although a city ordinance indicated that the property, which had previously been zoned for apartments, should automatically have received comparable zoning upon annexation, (2) the city's granting a three-year tax moratorium although the city charter required equal taxation of all real property, (3) the city's waiving the $100 rezoning fee, and (4) the city's failing to give two readings of the annexation ordinance as required by the city charter. While the city defendants have presented plausible explanations of some of these aberrations, a factual dispute remains concerning the city's motivation. The action would survive a motion for summary judgment on the issue of racially discriminatory intent.

The action cannot proceed, however, because there is no plaintiff who has sufficiently alleged standing, none that has alleged that he was personally injured by the city's actions whatever its motivation may have been. The history of this four-year-old suit, a history more complex than that of the underlying controversy, explains the absence of such a plaintiff.

Civil Action No. C 81–461 A was originally brought as a class action with two named plaintiffs. They were Betty Anderson, a black woman who lived in Roswell, and Arlene Hudson, a white woman who lived in Alpharetta in a trailer that was allegedly unsafe and unsanitary. It was alleged that Ms. Anderson was born on property that is now a part of Alpharetta, that she worked in the vicinity of Alpharetta, but that she was forced to live in Roswell because of the lack of low-income housing in Alpharetta. Ms. Anderson was the only plaintiff even superficially comparable to plaintiff Ransom in the *Arlington Heights* case who successfully supported his standing by alleging that he had a job at the Honeywell factory in Arlington Heights, that he was forced to live twenty miles away in Evanston, and that he would qualify for and would move to the proposed housing development in Arlington Heights. The allegations of the standing of Ms. Hudson, the white plaintiff, were not as clearly focused, revealing more her desire to live in integrated public housing than her need to live in the Alpharetta vicinity.

Soon after the action was filed, the plaintiffs requested conditional certification of a class composed of "all persons, black and white, eligible for public housing operated by the Fulton County Housing Authority, who are in need of decent, safe, and sanitary housing and who desire but are unable to live in such housing in the Alpharetta community because of the defendants' actions." On October 23, 1981, Judge O'Kelley refused to certify the class for several reasons. He held, first, that the plaintiffs did not meet the numerosity requirement for a class action, because they failed to show that any qualified persons other than the named plaintiffs desired low-income

housing in the Alpharetta area, and, second, that the plaintiffs were not adequate representatives of the proposed class. The depositions of the named plaintiffs indicated that they were unaware of the specifics of the lawsuit, including the identity of the defendants. The relief requested by the named plaintiffs also indicated that they were not true representatives of the proposed class since Betty Anderson and Arlene Hudson sought development of public housing in Alpharetta while plaintiffs who were allegedly representatives of the same class in a related suit sought development of public housing in the Sandy Springs area. Finally, Judge O'Kelley denied class certification on the alternative basis that certification was unnecessary since the injunctive relief sought by the named plaintiffs would achieve the desired result. The reasoning of Judge O'Kelley's order should have served as an early warning in 1981 that the class action would fail unless other plaintiffs could be found who had a need to live in public housing near Alpharetta.

On February 2, 1982, Ms. Anderson died. Her attorneys filed a suggestion of her death with the court on June 15, 1982, and a search began for a mechanism to ensure that the action would survive her death.

Meanwhile, the case against the City of Alpharetta was consolidated with the related case against the Fulton County Commissioners. In June 1982, discovery in the Fulton County case was suspended pending the appeal of the dismissal of the federal officials. Discovery, however, had been completed by April 1982 against the City of Alpharetta and its officials. The plaintiffs requested an extension in the Alpharetta case only for discovery against the federal defendants and non-parties.

From July through October 1982, the plaintiffs' attorneys developed the following proposals which might salvage this suit despite the loss of the black plaintiff: (1) a motion to substitute her son and temporary administrator of her estate, Larry Cook, in her place as plaintiff; (2) an application for

leave to intervene as plaintiffs filed on behalf of Mary Cook, Gloria Cook, Janice Cook, and Dorothy Cook; and (3) an application for leave to intervene as a plaintiff filed on behalf of Albert Rogers.

In a December 30, 1982, order, Judge Forrester clearly indicated his concern that this "public interest" case be tried with a plaintiff representing black interests and almost as clearly indicated his concern that the solutions proposed by the plaintiffs' attorneys were not adequate for that purpose. He deferred ruling on the motion for substitution and the motions to intervene.

Judge Forrester ultimately ruled that Ms. Anderson's claim for prospective equitable relief did not survive her death under Georgia law. He therefore allowed the substitution of her administrator only for the nominal damages claim and not for injunctive relief.

On February 18, 1983, the NAACP filed a motion to intervene as a plaintiff both in its representative capacity and in its own right as an organization. Subsequently, Judge Forrester chose the intervention of the NAACP as the mechanism which would best preserve the public interest litigation with the least prejudice to the original parties due to the reopening of discovery and the delay of trial. He granted a limited discovery period of 30 days for and against the new plaintiff and specifically reserved the issue of the NAACP's standing until discovery was completed. On May 27, 1983, the Alpharetta defendants served interrogatories on the NAACP seeking the identification of and information on any members which the NAACP alleged were harmed by the City of Alpharetta as well as information on any injury to the organizational activities of the NAACP.

Activity on both cases was suspended while the dismissal of the HUD defendants from the related case was appealed. Meanwhile, in September 1984, the consolidated cases were transferred to this judge and a conference was scheduled on October 12, 1984, to discuss settlement and to move the cases toward trial. Following the conference, the court directed counsel to prepare a brief statement of the cases including a short discussion of the existence of standing. When these statements were submitted, the court first learned that the NAACP had never answered the 1983 interrogatories and that due to the organization's failure to respond the city defendants were unable to challenge the factual basis of the NAACP's standing. Upon reviewing the file, this judge learned that despite repeated requests from the prior judges handling this suit that the plaintiffs support their standing, the case was proceeding rapidly towards trial with meaningless, conclusory averments of standing which could not meet the standards set by the United States Supreme Court in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982).

To have standing to sue on any claim, a plaintiff must have suffered a "distinct and palpable injury" as a result of the defendants' actions. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). To support standing to sue for racially discriminatory housing practices the plaintiff must further demonstrate that the defendants' actions affected the particular neighborhood in which the plaintiff resided. *Havens Realty Corp. v. Coleman*, 455 U.S. at 377, 102 S.Ct. at 1123. The Supreme Court has held that plaintiffs' merely alleging that they lived in the Richmond metropolitan area or in Henrico County, a suburb of Richmond, was not sufficient to support their standing to sue. *Id.* The Supreme Court required that the plaintiffs plead and prove the identity of a particular neighborhood in which they lived and the proximity of their homes to the site of the alleged discriminatory housing practice. The court discussed the need for the pleading of proximity as follows:

> It is indeed implausible to argue that petitioners' alleged acts of discrimination could have palpable effects throughout the *entire* Richmond metropolitan area. At the time relevant to this action the city of Richmond contained a population of nearly 220,000 persons, dispersed over 37 square miles. Henrico County occu-

pied more than 232 square miles, in which roughly 170,000 people made their homes. Our cases have upheld standing based on the effects of discrimination only within a "relatively compact neighborhood," [*Gladstone v.*] *Bellwood,* 441 U.S. [91] at 114, 99 S.Ct. [1601] at 1615 [(1979)]. We have not suggested that discrimination within a single housing complex might give rise to "distinct and palpable injury," *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206, throughout a metropolitan area.

*Havens Realty Corp. v. Coleman,* 455 U.S. at 377, 102 S.Ct. at 1123.

On November 21, 1984, the court ordered that the parties submit briefs on the standing issue and offered the NAACP the opportunity to amend the allegations in its complaint to add facts sufficient to establish standing under the *Havens Realty* case.

At a December 13, 1984, hearing counsel for the NAACP submitted its amended allegations of standing and presented oral argument on the existence of standing. The Atlanta Legal Aid Society, in contrast, failed to brief the standing of Arlene Hudson, the one plaintiff it still represented, but instead submitted a renewed motion to certify a class and renewed motions to intervene on behalf of Mary, Gloria, and Janice Cook and Albert Rogers.

Before considering whether the NAACP has met the requirements of *Havens Realty,* the court will review the status of the other potential plaintiffs. It is conceded that Larry Cook is no longer a plaintiff, since he was substituted only for purposes of damages claims which have since been withdrawn. Consequently, Ms. Anderson's claims are no longer represented in this suit. The court was informed by the Atlanta Legal Aid Society that it did not brief the standing of Arlene Hudson because she had moved to Forsyth County and bought a trailer. The Legal Aid Society has since filed a motion for the withdrawal of the white plaintiff, Arlene Hudson, from this action.

The Cooks and Albert Rogers are not viable plaintiffs for a multitude of reasons. First, they have not complied with the direction of Judge Forrester in the December 30, 1982, order that they present a plan which would lessen the prejudice to the original parties of the "broad scaled reopening of discovery" that intervention would entail. The proposed intervenors did not offer any accommodation to the defendants in 1982 and have offered little on the renewed motions in 1984. The applicants vaguely assure the court that they will "expedite whatever discovery is necessary."

Second, the motions to intervene are not "pending" as argued by the Atlanta Legal Aid Society. On page 10 of the December 30, 1982, order it was clearly indicated that the substitution of the administrator and the applications of the intervenors were being considered as mutually exclusive options and that if the judge allowed substitution of Larry Cook he would deny the motion for intervention. Therefore, the May 25, 1983, order which permitted the substitution of Cook and allowed the intervention of the NAACP also implicitly denied the other motions to intervene.

Third, the granting of intervention would be futile since in their applications to intervene, the Cooks and Albert Rogers sought public housing anywhere in the north Fulton County area and alleged no special connection with the Alpharetta area. Even if those individuals were allowed to intervene, they would promptly be dismissed for lack of standing.

Finally, the court was informed on January 22, 1985, that attorneys for the Atlanta Legal Aid Society had learned during the course of their trial preparation that Albert Rogers, along with two named plaintiffs in the consolidated cases, had found satisfactory housing and did not wish to pursue his claim.

The renewed motion to certify a class in the case against the City of Alpharetta presents no new support for the existence of any other members in the class. The

motion to certify a class is accordingly DE-NIED.

In summary, Larry Cook, as administrator of the estate of Betty Anderson, is DISMISSED in the Civil Action No. C 81–461 A; Arlene Hudson is DISMISSED as a plaintiff in the same action; the motions to renew the applications to intervene on the part of Mary, Gloria, and Janice Cook are DENIED in the consolidated actions; and the motion to renew the application of Albert Rogers to intervene is WITHDRAWN from both actions. This leaves the NAACP as the only remaining plaintiff in the action against the City of Alpharetta.

The NAACP submitted proposed amendments to the complaint with its motion to intervene in 1983. The allegations concerning the standing of the NAACP were vague, conclusory, and devoid of fact. Conclusory allegations are appropriate for most purposes under federal pleadings standards, but factual averments are required in order to demonstrate standing. *See Havens Realty Corp.*, 455 U.S. at 378, 102 S.Ct. at 1124.

When this court suggested that the NAACP should redraft its defective averments to comply with the requirements of *Havens Realty Corp.*, the court gave specific directions to focus on injury caused by the actions of the City of Alpharetta concerning the Hopewell Road site rather than the injury caused by the general unavailability of public housing in north Fulton County, to identify neighborhoods where injury allegedly was felt and the proximity of those neighborhoods to the City of Alpharetta, to identify members of the NAACP who were injured as support for the standing of the NAACP in its representative capacity, and to identify concrete injury to the organization's activities, for example demonstrable drain or waste of resources allocated to its housing referral service, in support of its standing in its own right.

At the subsequent hearing on standing, counsel for the NAACP argued that it was not necessary to identify an area of injury any smaller than the northern portion of Fulton County. The logic of counsel's argument can be summarized as follows: Although the NAACP alleged that a discrete act of annexation by a town of 18 square miles injured an area the size of half a county, or approximately 265 square miles,[2] the NAACP did not allege injury throughout the entire metropolitan area because Atlanta's population spills over into several counties. Therefore, the NAACP stated that it had complied with the requirements of *Havens Realty Corp. v. Coleman.*

The NAACP's argument is not persuasive. Comparison of the identified geographical area of injury to the metropolitan area was not significant in *Havens Realty Corp. v. Coleman;* the unworkably large population and immense size of the identified area were dispositive. Fulton County, although it does not encompass the entire Atlanta metropolitan area, is over twice as large as Henrico County and has a population greater than that of Henrico County and Richmond combined. This court holds that an allegation that a plaintiff cannot find adequate low-income housing in all of Fulton County, or even in north Fulton County, due to the abandonment of a plan to place 50 units of public housing on one site on Hopewell Road is implausible under *Havens Realty.*[3]

The revised complaint submitted by the NAACP on December 13, 1984, is also inadequate. Paragraphs 7(f) through 7(*l*) once again allege generally that the NAACP's Atlanta office operates a full-time service to find jobs and affordable housing for

2. Although attorneys on both sides have frequently referred to "North Fulton County," this does not appear to be an official geographical subdivision. No basis for delineating this area other than roughly splitting the county in half has been presented to the court.

3. The court's conclusion concerning the implausibility of injury throughout a vast area would be different when the discriminatory policy was allegedly in effect for decades and affected all proposed public housing in the unincorporated area of the county. *See* separate order of this date in the related case, Civil Action No. C 81–1547 A.

low-income minority families throughout the metropolitan Atlanta area. The revised allegations of standing provide no factual support for the existence of a referral service, for the allocation of funds to that service, for instances of individuals seeking housing referrals to the Alpharetta area, for instances of Alpharetta employers seeking applicants through the job referral service, and consequently no support for the bare allegation that the service was rendered ineffective by the City of Alpharetta's actions. In short, the revision provides no factual averment of concrete injury to the NAACP, and the NAACP must be DISMISSED as a plaintiff in its organizational capacity.

In its representative capacity, the NAACP originally alleged injury to all 11,-000 of its members living or working in Fulton County and to the abstract social interests of those members. In the November 21, 1984, order this court pointed out that such allegations are insufficient to support representational standing under *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and that the NAACP would have to identify injury to particular members as required under *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). In its revised complaint, the NAACP failed to identify any individual member as directed by the court, but its brief on standing, which was submitted at the same time, referred the court to the NAACP's very recent responses to the May 1983 interrogatories. Those responses were received by the City on December 3, 1984, ten days before the hearing on standing and approximately one month before trial. They identified, for the first time, the names of NAACP members who had allegedly been injured.

Injury was claimed in two senses. First, in answer to Alpharetta's interrogatory number 7, the NAACP listed names, addresses, incomes, and the number of family members for 10 persons who allegedly would have desired to live in public housing on the Hopewell Road site. That list, however, does not provide the factual aver-

ments requested by the court. The list does not identify any "relatively compact neighborhood," *see Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 114, 99 S.Ct. 1601, 1615, 60 L.Ed.2d 66 (1979), does not establish the proximity of any of the addresses to the Hopewell Road site, *see Havens Realty Corp.,* 455 U.S. at 377, 102 S.Ct. 1123, does not establish the eligibility of any of the individuals for public housing if it were constructed on that site, *see NAACP v. Harris,* 607 F.2d 514, 525 (1st Cir.1979), and does not specify the connection of any of the individuals with the Alpharetta area, *see Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). Earlier in the response to the interrogatories, the NAACP generally indicated that several unidentified members were "long time residents of the Alpharetta area who work, attend church, and have other social, economic and family connections there" and who are "eligible for public housing and want to continue to live in the Alpharetta area." Those conclusory statements are not factually linked to any named member of the organization.

It is the responsibility of the plaintiff clearly to allege facts demonstrating that he is a proper party with standing to invoke judicial resolution of a dispute. *See Warth v. Seldin,* 422 U.S. at 518, 95 S.Ct. at 2215. It is not the role of the court to speculate concerning the existence of standing nor to piece together support for the plaintiff. The NAACP's reference to disjointed information in its response to interrogatory number 7 did not fulfill its affirmative duty to plead the standing of its individual members.

In its response to interrogatory number 6, the NAACP identified members who were allegedly injured in another sense. The response names four individuals who would have enjoyed social, economic and political benefits if integrated public housing had been provided on the Hopewell Road site although they had no need to move there themselves. These members

assert "neighborhood" standing, a form of third party standing in which a plaintiff asserts an injury to another. Such standing is sometimes viable, *see Havens Realty Corp.*, 455 U.S. at 375, 102 S.Ct. at 1122, but the allegations concerning the second set of NAACP members are deficient for a number of reasons. First, the particular neighborhoods and their proximity to the Hopewell Road site must be demonstrated for "neighborhood" standing as well as for individual standing. *Id.* at 337, 102 S.Ct. at 1123. Second, it is questionable whether an individual could be derivatively injured by the city's actions when, after a four year period, no one has been identified who was directly injured. Third, attempts to raise the putative rights of third parties are subject to prudential considerations which limit the role of courts as well as constitutional limitations. *Warth v. Seldin*, 422 U.S. at 514, 95 S.Ct. at 2213.

The court finds that the NAACP has failed to aver adequately injury in fact, directly or derivatively to any of its members. Accordingly, the NAACP is DISMISSED as a plaintiff in its representative capacity.

After four years of pursuing this public housing suit, the attorneys for the plaintiffs, with access to the membership lists of the Atlanta chapter of the NAACP, have failed to identify a single plaintiff who has been personally and concretely injured by the alleged discriminatory practices of the City of Alpharetta. In arguing for the survival of the suit despite the lack of a single viable plaintiff, those attorneys invoked the following comment made by Judge Forrester after being informed of the death of one of the original plaintiffs, Betty Anderson: "[I]t does seem unfair to deny intervention and thence improve the defendant's position in the case on the fortuity of the death of the one plaintiff who *de facto* represented interests of black people." *See* December 30, 1982, order at page 6. It is only fair to point out that the death of Ms. Anderson probably did not benefit either side in this controversy. Her 1981 deposition reveals that while Ms. Anderson had a limited education, she possessed a forthrightness that could have benefited the defense of this case. She stated that she had lived near Alpharetta for 44 years, that she recognized the names of some of the city officials who were named as defendants, that her brother who still lived in the Alpharetta area knew some of the defendants personally, that there was no discrimination between blacks and whites in Alpharetta when she was growing up, and that she knew of no statements or actions on the part of any of the individually named city officials to discriminate against blacks. Such testimony would have countered the circumstantial evidence of discrimination which her own attorneys would introduce at trial. Further, Ms. Anderson stated that due to a change in management she was presently satisfied with her private housing arrangements in Roswell, that she was taking home over $900 a month, that her son contributed a full-time salary to the family as well, that she had no particular reason for preferring the Hopewell Road site, and that her basic reason for wanting to move to public housing was her belief that it would be less noisy than her private apartment. It is questionable whether Ms. Anderson was eligible for or in need of public housing in Alpharetta. Ms. Anderson's deposition foreshadowed the ultimate disposition of this case. Even before her death, this action was vulnerable to dismissal for lack of a plaintiff who could demonstrate injury in fact.

Due to the withdrawal or dismissal for lack of standing of all potential plaintiffs in Civil Action No. C 81–461 A, the action against the City of Alpharetta is DISMISSED.