OPINION OF THE COURT
Lottie E. Wilkins, J.
The petitioner Woodlawn Veterans Mutual Housing Co., Inc., has made application to this court for a judgment pursuant to CPLR article 78 nullifying and vacating an order and opinion issued on April 30, 1992 by the respondent, New York State Division of Housing and Community Renewal (D.H.C.R.). The order was issued pursuant to the D.H.C.R.’s Special Open Access Minority Participation Program (S.O.A.M.P.P.) for Mitchell-Lama Housing Companies. (See, 9 NYCRR subpart 1727-7.)
Petitioner also moves for an order directing D.H.C.R., during the pendency of this proceeding, to pass upon all applica *641 tions to fill vacant apartments at Woodlawn Veterans housing project (Woodlawn).
Woodlawn is a cooperatively owned limited-profit housing company which contains 100 dwelling units. Woodlawn was organized and exists under article 2 of the Private Housing Finance Law for the purpose of providing adequate, safe and sanitary housing for all eligible individuals with the aid of private enterprise.
As an article 2 housing company (Private Housing Finance Law §§ 11, 13 [13]), Woodlawn receives a property tax abatement and is the recipient of a below market mortgage rate from the State of New York (Private Housing Finance Law §§ 22, 33.)
An examination of this action at bar necessitates that it be reviewed against the background of a precursor litigation which challenged tenant selection procedures at Starrett City, another Mitchell-Lama Housing Company. Starrett had instituted a tenant selection procedure to insure its own policy of integration.
In December 1979 a group of black applicants brought an action in Federal court against Starrett City Associates and the D.H.C.R., which alleged that Starrett’s tenanting procedures violated Federal and State law by discriminating against them on the basis of race.
The parties in the Starrett City matter stipulated to a settlement in May 1984. A consent decree was entered after review and approval by the Federal District Court, Eastern District of New York. (See, Arthur v Starrett City Assocs., US Dist Ct, ED NY, index No. 79-CV-3096, Apr. 2, 1985.)
The decree provided among other things that Starrett in exchange for maintaining its policy of integration would, depending on apartment availability, make an additional 35 units available each year for a five-year period to black and minority applicants.
More far-reaching, the consent decree in pertinent part also sets forth that the D.H.C.R., pursuant to regulations, will undertake an affirmative enforcement program to promote integration in covered D.H.C.R. projects, and to also eliminate unlawful acts of discrimination which have the foreseeable consequence of limiting or excluding minorities from the projects. Such pertinent part of the decree provides that if the commissioner finds any act, failure to act singly or in combination; including, but not limited to:
*642 "43. (a) housing discrimination against minorities other than acts covered by subparagraph (d) below:
"(b) failure to comply with those parts of D.H.C.R.’s regulations, on Equal Opportunity and Fair Housing in Projects of Regulated Housing Companies, which came into effect on July 7, 1982 (N.Y.S. Register, August 4, 1982, p. 10; N.Y.S. Register, June 2, 1982, pp. 4-6);
"(c) failure to comply with other D.H.C.R. regulations relating to tenant selection practices, waiting lists, and marketing, as codified in 9 N.Y.C.R.R. Part 1727 and in effect at the time of the failure to comply, with the foreseeable consequence of limiting or excluding minorities from the project; or,
"(d) an act or failure to act which had the foreseeable consequence of limiting or excluding minorities from the project. The Commissioner will find such an act or failure to act if the covered D.H.C.R. project:
"(i) upon creation or reopening of a waiting list, failed to advertise the availability of applications or apartments in newspapers or general circulation; or,
"(ii) upon creation or reopening of a waiting list, failed to advertise the availability of applications or apartments in a widely read minority newspaper; or,
"(iii) failed to include a statement of nondiscrimination or equal housing opportunity in advertisements of the availability of applications or apartments; or,
"(iv) conducted systematic outreach but failed to conduct outreach to minority groups or in minority communities; or "(v) has a preference for admission to the project for family members or relatives or friends of tenants or cooperators.
"The above list does not limit the Commissioner’s discretion to find such an act or failure to act, under this subparagraph (d), under other circumstances.
"44. (a) If the Commissioner finds an act or failure to act under subparagraph 43 (d), she will find impermissible exclusion of or discrimination against minorities unless, in a given case based on her review of all the facts, she has a substantial basis for finding otherwise. In such a case, she will set forth the specific reasons that support her finding.”
The goals of the Open Access Plan (OAP) are to create a minority waiting list for a particular covered D.H.C.R. project accompanied by a specific affirmative marketing effort designed to assure that minorities learn of the creation of the *643 list, to void existing waiting lists and to replace such lists with new lists created in accordance with the affirmative fair marketing regulations, which may include a new waiting list and the ranking of applicants on the list, and to achieve 20% minority occupancy, by units, in covered D.H.C.R. projects within 15 years, with vacant units to be filled by minorities at a rate not greater than two of every five vacant units.
The D.H.C.R. then established S.O.A.M.P.P. in accordance with the consent decree as set forth in regulations codified at 9 NYCRR part 1727.
On or about September 10, 1986, D.H.C.R. determined that Woodlawn was a covered project. That determination was based upon Woodlawn’s conduct of a census which identified only 2.2% of its tenant population as minority. Pursuant to the regulations, D.H.C.R. then notified Woodlawn that as a covered project it must submit a voluntary Open Access Plan to achieve the S.O.A.M.P.P. goal.
Woodlawn did not submit a voluntary Open Access Plan but instead responded by letter dated November 13, 1986 that it had a 9-to-l 1-year waiting period with a low turnover rate for apartments. Woodlawn further asserted that it believed that many minority families were on the waiting list, and that minorities were never excluded or discriminated against by Woodlawn. Thereafter, on February 25, 1987 and April 20, 1988, D.H.C.R. notified Woodlawn of an investigatory proceeding and directed the housing company to provide specific information regarding its tenant selection practices, waiting list, fair marketing plan and newspaper advertisements, if any. Woodlawn’s participation in the investigation consisted of its response dated April 20, 1988 that there was no need to advertise since the active waiting lists were always long, that information concerning vacancies was mostly verbally announced at open meetings or when a potential applicant requested an application, that the housing company did not have a fair marketing plan, and that no applicant had been found to be ineligible for admission.
On January 16, 1990, D.H.C.R. conducted an examination of Woodlawn’s housing records which indicated that Woodlawn was not properly administering the waiting list and that the active waiting list was largely inactive. A report concerning preliminary findings of probable cause was issued on February 23, 1990.
D.H.C.R. then issued specific preliminary findings of proba *644 ble cause concerning Woodlawn’s excessive application fee of $100, Woodlawn’s tenant selection practices, Woodlawn’s lack of an affirmative fair marketing plan and Woodlawn’s failure to maintain a waiting list in accordance with regulatory requirements. (S.O.A.M.P.P., 9 NYCRR subpart 1727-7.)
In accordance with the S.O.A.M.P.P. regulations, Woodlawn had an opportunity to respond to D.H.C.R.’s determination by either submitting a voluntary Open Access Plan or a specific rebuttal to each finding together with supporting evidence. Woodlawn chose to submit a rebuttal, by way of a letter dated April 2, 1990, which in part asserted D.H.C.R.’s long-term awareness of the shortcomings in that housing company’s practices. Woodlawn attributed it’s failure to properly canvass, purge and to otherwise maintain the waiting list and bound books on its reliance upon the D.H.C.R.’s knowing failure to previously advise the housing company of such violations. Woodlawn’s rebuttal also reiterated its claim of a long waiting list and low turnover rate as the basis for not instituting a fair marketing plan in conjunction with the new waiting list as required by the D.H.C.R. Woodlawn also reasoned that the $100 application fee was proper, based upon information that other housing companies were charging the same fee.
Upon consideration of Woodlawn’s responses, and also Woodlawn’s rebuttal letter of April 2, 1992, D.H.C.R.’s Deputy Commissioner issued a decision and order dated April 30, 1992, which determined that Woodlawn had violated the Division’s regulations relating to marketing, waiting list and tenant selection practices.
The specific findings of violation pursuant to the S.O.A.M.P.P. regulations (9 NYCRR subpart 1727-7) consisted of the following: Woodlawn’s failure to implement a fair housing marketing plan, even though its waiting list had never been closed and it had continued to accept applications; Woodlawn’s failure to remove applicants from the waiting list after second refusals; Woodlawn’s failure to conduct annual canvasses of applicants to determine continued interest; Wood-lawn’s failure to remove ineligible applicants from the waiting list; and Woodlawn’s collection of excessive processing fees from applicants.
The decision further noted that such violations, singly and in combination, had the foreseeable consequence of limiting or excluding minorities from the project.
*645 Based on these findings, the Commissioner by his decision of April 30, 1992 ordered that Woodlawn take steps to comply with the Division’s regulations. The decision specifically provided that Woodlawn canvass all applicants on the waiting list to determine their continued interest in admission to Wood-lawn, submit, for the Division’s approval, an affirmative fair housing marketing plan to attract eligible applicants least likely to apply to the project or a request for permission to discontinue acceptance of applications for admission to the project, and refund all excess application fees collected.
In addition, the Commissioner ordered that Woodlawn create a minority waiting list and assign to minorities two of every five vacant units until April 14, 2001, or the OAP goal was attained, or the Division determined otherwise.
A court’s function in a CPLR article 78 proceeding involving the review of an administrative action is to determine whether a rational basis exists to support the action of the administrative body or officer. (Matter of Colton v Berman, 21 NY2d 322 [1967].)
It is well established that the reviewing court, in passing upon questions of law, "may not substitute its own judgment of the evidence for that of the administrative agency, but [the Court] should review the whole record to determine whether there exists a rational basis to support the findings upon which the agency’s determination is predicated.” (Matter of Purdy v Kreisberg, 47 NY2d 354, 358 [1979]; see also, 300 Gramatan Ave. Assocs. v State Div. of Human Rights, 45 NY2d 176, 182 [1978]; Matter of Pell v Board of Educ., 34 NY2d 222, 230-232 [1974].) If the challenged determination has a factual basis, it should be sustained. Even if the court "would have reached a contrary conclusion,” it should not disturb an agency’s otherwise valid determination. (Matter of Sullivan County Harness Racing Assn. v Glasser, 30 NY2d 269, 277-278 [1972].) Furthermore, "[rationality is what is reviewed under both the substantial evidence rule and the arbitrary and capricious standard.” (Matter of Pell v Board of Educ., 34 NY2d, at 231.)
The standard to be applied in reviewing agency action is whether the decision is arbitrary and capricious. This test has been interpreted to mean a willful and unreasoning action without consideration of or in disregard of the facts or determination without a factual basis. (Matter of New York State AFL-CIO v Stimmel, 105 Misc 2d 545 [Sup Ct, Albany County *646 1980], citing Matter of Elwood Investors Co. v Behme, 79 Misc 2d 910 [Sup Ct, Suffolk County 1974], and Matter of Highland Brooks Apts. v White, 40 AD2d 178 [4th Dept 1972].) Thus, "a petition alleging arbitrary conduct may be dismissed * * * [where] any reasonable basis can be envisaged to support the conduct.” (24 Carmody-Wait 2d, NY Prac § 145:318.)
The petitioner Woodlawn contends upon this application that the D.H.C.R.’s determination has no factual or rational basis and that such determination is arbitrary and capricious for the following reasons: (1) the D.H.C.R. misinterpreted Woodlawn’s response and rebuttal to the investigation by taking statements by the housing company out of context, (2) the D.H.C.R. ignored Woodlawn’s size, location, limited number of move outs, and long waiting periods, (3) the D.H.C.R. ignored the tenant selection and waiting list procedures which have been followed by Woodlawn for over 25 years with the D.H.C.R.’s knowledge and consent.
Although the D.H.C.R. dismisses each of Woodlawn’s contentions as meritless, the court notes that Woodlawn’s past tenant selection practices continued after the D.H.C.R.’s inaction and were contrary to the purpose of the statute (Private Housing Finance Law) and the D.H.C.R.’s Fair Housing Regulations. Woodlawn charged high application processing fees, Woodlawn maintained artificially inflated waiting lists containing both over-income and second-refusal applicants, and otherwise failed to conduct annual canvasses to determine continued interest. Furthermore, Woodlawn announced the availability of vacancies by word of mouth at open meetings, all without the implementation of an affirmative fair housing marketing or advertising program.
Given Woodlawn’s small minority population, Wood-lawn’s practice of word of mouth announcement of vacancies would have the effect of favoring insiders over minority outsiders, and also foreseeably excluding and discouraging outsiders from applying to the project. Therefore, this court finds there was a rational and an ample factual basis in the record to support the D.H.C.R.’s determination that Woodlawn’s tenant selection and waiting list practices singly and in combination constituted impermissible exclusion, and/or discrimination. Such acts had the foreseeable consequence of limiting or excluding minorities from the project and the waiting list.
Therefore, petitioner’s application to set aside the D.H.C.R.’s determination as being arbitrary, capricious and without a factual or rational basis is denied.
*647 The court next turns to Woodlawn’s argument that the D.H.C.R., because of a quarter of a century of inactivity, is estopped from implementing the S.O.A.M.P.P. at this housing project.
Woodlawn would have this court believe that until very recently the D.H.C.R. has been inactive in enforcing the purpose of the regulations, rules and Private Housing Finance Law. However, any inaction by the D.H.C.R. concerning discriminatory tenant selection practices in D.H.C.R. projects prior to 1986 was affirmatively addressed and brought to conclusion by the D.H.C.R.’s Fair Housing Regulations of 1982, and subsequently by the Starrett consent decree entered in Federal District Court, Eastern District of New York, effective April 1985 and the S.O.A.M.P.P. regulations codified at 9 NYCRR subpart 1727-7 effective April 1986. As such, any period of inactivity by the D.H.C.R. through 1986 is a moot point. Since 1986, to date, there has been continuous enforcement activity by the D.H.C.R. to implement the S.O.A.M.P.P. at Woodlawn.
Woodlawn cannot use the D.H.C.R.’s alleged inaction as a sword to press its claim for why it should not be accountable for past discriminatory violations, and at the same time use such circumstances as a shield to now prevent the application of D.H.C.R.’s remedial action to the Woodlawn project.
Contrary to Woodlawn’s contention, estoppel may not be applied to preclude a State agency from discharging its statutory responsibilities, even after a period of inactivity. (Scruggs-Leftwich v Rivercross Tenants’ Corp., 70 NY2d 849 [1987]; Rubel Corp. v City of New York, 73 NYS2d 813, 819, affd 274 App Div 925 [1st Dept].) Moreover, the doctrine of waiver does not apply to regulated housing. (Matter of City of New York v City Civ. Serv. Commn., 60 NY2d 436, 449 [1983].)
Therefore, the court rejects as without merit Woodlawn’s argument that the D.H.C.R. is estopped from now taking statutorily mandated action to remedy the effects of past discrimination at this housing project.
Woodlawn’s final claim is that preferential treatment for minority applicants, and its resultant discrimination against nonminority applicants, inherently raises constitutional issues.
The first level of this court’s analysis of Woodlawn’s constitutional claim begins with the rule of law that courts will only consider a justiciable controversy, as distinguished from a *648 hypothetical difference or dispute. (Aetna Life Ins. Co. v Haworth, 300 US 227, 239.) In other words rights must be declared upon an existing state of facts, and not upon a state of facts that may or may not arise in the future.
Woodlawn must allege an injury in fact. Also as an aspect of justiciability is the standing question as to whether Wood-lawn has alleged such a personal stake in the outcome of the controversy as to warrant the invocation of the court’s jurisdiction and to justify exercise of the court’s remedial powers on its behalf. (Warth v Seldin, 422 US 490 [1975]; Acevedo v Nassau County, 500 F2d 1078 [1974].)
With those guidelines in mind, the court finds Wood-lawn’s allegation of a discriminatory result to white applicants to be deficient. After some several years into this proceeding, Woodlawn, with access to the applicant’s list, has failed to identify a single applicant who has been personally and concretely injured by the D.H.C.R.’s determination to access apartments at Woodlawn to minority applicants. Second, it is questionable that Woodlawn’s interests could be derivatively injured by the D.H.C.R.’s determination when, after a several year period, no one has been identified who was directly/derivatively injured. Third, without a personal stake in the controversy, Woodlawn has no standing to raise the putative rights or interest of third parties.
Therefore, the possibility of harm from the D.H.C.R.’s action is at best remote, and insufficient to meet the requirements of "justiciability” and "case or controversy”.
The court begins the next level of its analysis of the issue of discrimination by noting that it is well settled that there is no Federally protected right to low income housing in a particular community, and existing occupants may not keep members of another racial group from entering the community. (Civil Rights Act of 1968 § 804 [b], 42 USC § 3604 [b], [d]; Schmidt v Boston Hous. Auth., 505 F Supp 988 [1981]; Acevedo v Nassau County, 500 F2d 1078 [1974], supra.) The Supreme Court has expressly recognized the importance to a community of promoting stable, racially integrated housing, because "substantial benefits flow to both whites and blacks from interracial association” (Linmark Assocs. v Willingboro, 431 US 85, 94-95 [1977]).
The implementation of a race-conscious affirmative action plan does not necessarily violate Federal or State Constitutions. Access quotas have generally been upheld where tempo *649 rary in nature, with a defined goal, and when narrowly tailored to the achievement of that goal, as its termination point. (United States v Paradise, 480 US 149, 166 [1987].)
The S.O.A.M.P.P. by its very nature is a quota plan. The quota plan for Woodlawn is based on some history of racial discrimination by the agency D.H.C.R. and its housing companies. It is specifically targeted to those groups who have been previously excluded from these projects, the plan is temporary in nature with a defined goal for termination — at most nine years, until 2001, or sooner if the S.O.A.M.P.P. goal of 20% minority occupancy is reached before that time. The plan is, likewise, justified by a compelling governmental interest to see that public housing is available to all, especially in a public housing project from which some have been excluded.
Indeed, remedying the manifestations of past discrimination in public housing is a statutorily mandated as well as a compelling governmental interest no matter what may be the size, or the location of the project, or the number of move outs. It is beyond dispute that any public entity, State or Federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice. (Richmond v Croson Co., 488 US 469 [1989].)
Therefore, petitioner’s challenge to the S.O.A.M.P.P. itself fails to make out a claim for antidiscriminatory relief under the Civil Rights Act or the Equal Protection Clause. This is especially so since this program of affirmative action arose out of ongoing Federal court litigation to remedy the past effect of discriminatory tenant selection practices against minority applicants in projects built with Federal funds. The procedures involved in formulating the program were closely regulated by the Federal court and the program itself is subject to a continuing review by the Federal court. The series of events leading up to the implementation of the program by the D.H.C.R.. in fact complied with the procedures set forth in the consent decree. Petitioner does not allege that the officials involved in formulating the program were motivated in any way by a desire to discriminate against whites. Nor does petitioner allege that there were any departures in the procedural sequences involved in implementing the program as applied to the Woodlawn project. Absent proof of such departures this court will not infer improper purpose or departure from normal substantive considerations.
*650 Under the circumstances of this case, it is apparent that there are no facts herein which would be sufficient to sustain a finding of discriminatory purpose by the D.H.C.R. against nonminority applicants when measured against the foregoing factors.
Therefore, based upon all the reasons stated, the petition is dismissed.
The petitioner’s companion application to compel the respondent D.H.C.R. to process all applications for the purchase of vacant apartments at Woodlawn during the pendency of the CPLR article 78 proceeding is denied as moot, given the dismissal of the underlying action.