[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-11542

_____

**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**April 7, 2005**
**THOMAS K. KAHN**
**CLERK**

D. C. Docket No. 02-01253-CV-ORL-28-JGG

ALFRED L. BOCHESE,

Plaintiff-Appellant,

versus

TOWN OF PONCE INLET, a municipal
corporation organized under the
laws of the State of Florida,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(April 7, 2005)**

Before EDMONDSON, Chief Judge, and MARCUS and PRYOR, Circuit Judges.

MARCUS, Circuit Judge:

Appellant Alfred L. Bochese brought this suit against the Town of Ponce

Inlet ("the Town" or "Ponce Inlet") challenging, under 42 U.S.C. § 1983, the

Town's rescission of a contract it had entered into with a private developer for the construction of an oceanfront condominium complex. In essence, Mr. Bochese claimed that rescinding the contract violated his First Amendment free speech, Fourteenth Amendment due process, Fourteenth Amendment equal protection, and Article I, § 10 contract rights. The district court granted summary judgment for the Town. It is from this judgment that Mr. Bochese now appeals. Although the parties have not raised the issue here, we are obliged to consider, sua sponte, the question of our subject matter jurisdiction to hear the case before us. After thorough review, we conclude that Mr. Bochese lacks constitutional standing to challenge the rescission of the contract between the Town and the developer, since he was neither a party to nor an intended beneficiary of that agreement, and therefore lacks a legally enforceable interest in that contract. In short, we do not have the power to entertain the appeal.

I.

A.

The essential facts are these. Appellant Bochese has owned a single-family residence on an oceanfront lot in the Town of Ponce Inlet since at least November 8, 1983. Ponce Inlet, an incorporated municipality, was originally chartered in 1963, at which time its charter contained no zoning provisions. Over time, the

2

Town enacted various zoning regulations; the following chronology highlights those salient to this case.

In 1983, the Town Council, Ponce Inlet's governing body, proposed an amendment to the Town Charter to establish a maximum height of 35 feet for all buildings. The amendment was approved by referendum in the Town's November election, and the Town Charter was amended to contain the provision: "Buildings within the Town of Ponce Inlet shall be limited to a maximum height of thirty-five (35) feet." This amendment contained no exemptions to or exclusions from the 35-foot height limit. R. 93, Ex. 58.[1]

In May 1984, the Town Council adopted Ordinance 84-11, creating certain exceptions to the charter amendment's 35-foot height limit. Ordinance 84-11 stated that the limitation would not apply to properties zoned "T-1" ("Tourist Accommodation") or "PUD" ("Planned Unit Development") as of November 8, 1983. The ordinance further provided that PUD-zoned property "may be developed under the terms and provisions of applicable P.U.D. agreements between the Town and property owner, or developer of property classified P.U.D. as of November 8, 1983." The ordinance explained that it was the "interpretation

_____

[1]Our citations to the record in this case denote the number of the district court docket entry containing the cited material as "R. X," and any exhibit thereto as "Ex. X."

3

of the Town Council that the charter amendment adopted by the electors does not require that all property presently zoned to permit buildings of a height in excess of thirty-five (35') shall be restricted in the future to prohibit buildings of a height no greater than thirty-five (35') feet." R. 93, Ex. 17. Subsequently, in November, 1985, the Town enacted Ordinance 85-27, which left Ordinance 84-11 intact, but established a maximum building height of 70 feet for all properties exempt from the 35-foot building height limit. R.93, Ex. 83, ¶ 7.

In July 1986, the Town adopted the third relevant Ordinance, 86-12, approving a Development Agreement with the predecessors of Ponce Lighthouse Properties, Inc. ("PLPI"). R. 93, Ex. 83, ¶ 8. The Development Agreement, signed by the mayor, all members of the Town Council, and the developer, laid out the rules, criteria, and details for a Planned Unit Development (PUD) project. The agreement stated that the Town Charter provision restricting building height to 35 feet did not apply to the PUD. The agreement further specified that the oceanfront section of the PUD would have a maximum building height of 35 feet, while the rest of the property would have a maximum building height of 85 feet. R. 93, Ex. 19.

4

In 1990, the Town amended and readopted its charter. The new charter set forth the same 35-foot building height limitation, with no exemptions or exceptions. R. 93, Ex. 83, ¶ 10.

In February 2001, Ponce Lighthouse Properties, Inc. submitted a Development Review Application to the Town, seeking to include four contiguous 100-foot oceanfront lots in the existing PUD by changing their zoning from T-1 to PUD. Two of the four lots were vacant lots owned by PLPI; one was a residential lot owned by Michael DiFranco; one was a residential lot owned by Appellant Bochese. R. 93, Ex. 34. The Town's Land Development Code requires that at the time of submission of a PUD-related application, the applicant have unified ownership over the entire area within the PUD, which ownership must be maintained until after the recording of the overall development plan. Unified ownership means "under the ownership of one person, whether by deed, agreement for deed or contract for purchase." In its application to the Town, PLPI represented that all four lots "have either been purchased or [are] under contract to be purchased by [PLPI]." R. 93, Ex. 22. In fact, when PLPI submitted its application, PLPI and landowners Bochese and DiFranco had only signed letters titled "Proposal for Acquisition,"each of which stated that it was "not a

5

commitment to purchase or an offer to purchase on the part of PLPI." R. 112, Ex. 1.

Two months later, on April 18, 2001, the Town Council adopted Ordinance 2001-08, which repealed Ordinance 84-11(exempting T-1 and PUD properties from the 35-foot rule) in its entirety and amended the Town's Land Use and Development Code to eliminate all exceptions to the 35-foot building height restriction. R. 93, Ex. 38.

The following month, on May 21, 2001, the Town Council executed the Fourth Amendment to the Development Agreement ("Fourth Contract Amendment"), approving PLPI's request for inclusion of the four additional properties in its PUD. The Fourth Contract Amendment specified that up to 400 feet of PLPI's now-700-foot stretch of oceanfront PUD property (100 feet of which was Mr. Bochese's lot) could be developed with buildings up to 70 feet in height, but limited building height on the remaining 300 feet of the oceanfront property to 35 feet. R. 93, Ex. 37.

Several months later, on August 3, 2001, PLPI executed Purchase and Sale Agreements for both the Bochese and the DiFranco properties. R. 93, Exs. 43 & 44. The Bochese agreement, in substance, gave PLPI an option to purchase the Bochese lot. The agreement included an addendum providing: "The contract is

subject to [PLPI] obtaining the necessary approvals from the Town of Ponce Inlet, Florida for the construction of a 70 foot high condominium in a manner and design acceptable to [PLPI] at [PLPI's] sole discretion. In the event [PLPI] has not received said approvals by the closing date, [PLPI] shall have the option to close pursuant to the terms of the contract or terminate this Contract at its sole discretion." The addendum further provided: "As a condition precedent to [PLPI]'s obligation to close, is [PLPI]'s closing with Michael DiFranco . . . , either simultaneously with or prior to the closing of this transaction." As consideration for this option to purchase, PLPI placed in escrow a deposit of $25,000, $10,000 of which Mr. Bochese was entitled to retain if PLPI elected not to exercise the option. The contract set a closing date of December 1, 2001. R. 93, Ex. 43.

Apparently believing that PLPI would eventually purchase his property, Mr. Bochese decided to relocate. Within six months of executing the Purchase and Sale Agreement with PLPI, Mr. Bochese purchased real estate, developed building plans, and hired a builder to construct a home on his new lot. R. 44, ¶ 11.

In early November 2001, approximately a month prior to the original closing date, PLPI asked Mr. Bochese and Mr. DiFranco for extensions to their purchase agreements. Mr. Bochese agreed, and he and PLPI executed a second addendum to the agreement, extending the closing date to March 1, 2002. This

7

second addendum provided that PLPI would make nonrefundable monthly payments of $1200 to the Bocheses "[a]s consideration for the extension of the closing date." The second addendum also echoed the language of the first, making the Town's approval of a 70-foot condominium in a manner acceptable to PLPI a condition precedent to PLPI's purchase of Mr. Bochese's land. R. 93, Ex. 43.

Mr. DiFranco refused the extension, and his purchase agreement expired as scheduled on December 1, 2001. The expiration of the DiFranco agreement had the effect of destroying PLPI's unified ownership of the PUD property. Shortly thereafter, on December 31, 2001, Mr. DiFranco informed the Town that PLPI no longer had a contract to purchase his property, and requested removal of his property from the PUD by repeal of the Fourth Contract Amendment. R. 93, Ex. 61.

Meanwhile, on December 1, 2001, an amended Town Charter took effect, providing, without exception, that "[b]uilding within the Town of Ponce Inlet shall be limited to a maximum height of thirty-five (35) feet." R. 93, Ex. 83, ¶ 14.

Several months after Mr. DiFranco requested removal of his property from the PUD, the Town Council held a public meeting on the subject. PLPI and Mr. Bochese both addressed the Council, and Mr. Bochese expressed his opposition to removal of his property from the PUD. At this meeting, on February 27, 2002, the

8

Town Council adopted Resolution 2002-10, rescinding the Fourth Contract Amendment (which had added the Bochese and DiFranco lots into the PUD). R. 93, Ex. 75. Resolution 2002-10 listed as grounds for rescission of the Fourth Contract Amendment that PLPI had falsely represented that it controlled all of the properties to be incorporated into the PUD at the time it applied for their inclusion; that PLPI had no valid contract on the DiFranco property at any point, since the purchase agreement had failed to include Mrs. DiFranco as a party; that the DiFranco agreement expired on December 1, 2001, leaving PLPI with no legal entitlement to purchase the DiFranco lot; and that the DiFrancos no longer wished to sell their property, and demanded its removal from the PUD. R. 93, Ex. 75, § 2.

The rescission of the Fourth Contract Amendment removed the four beachfront lots (including Mr. Bochese's and Mr. DiFranco's) from PLPI's PUD, restoring those properties to their prior T-1 zoning classifications. The Town also proposed a Fifth Amendment to the Development Agreement ("Fifth Contract Amendment"), which, by its terms, permitted PLPI to proceed with the

9

construction of a condominium complex reaching a maximum height of 70 feet.[2] R. 93, Ex. 75, Ex. B.

Soon thereafter, the Town filed an action for declaratory judgment against PLPI in the Circuit Court, Seventh Judicial Circuit, in and for Volusia County, Florida, on the issue of "whether [PLPI] has a right to build a structure to a height in excess of thirty-five feet on the . . . property here in dispute, in apparent violation of the [Town] charter." Town of Ponce Inlet, Fla. v. Ponce Lighthouse Properties, Inc., No. 2002-20561 CICI, at 10 (Fla. 7th Cir. Ct. 2003) (R. 93, Ex. 83). The declaratory action named PLPI, Mr. Bochese, and Mr. DiFranco, as well as several other property owners, as parties. Mr. Bochese, however, was voluntarily dismissed as a party after he filed a motion to dismiss the declaratory action. Nevertheless, PLPI maintained that it had an interest in the Bochese lot, and thus that property was included in the disposition of the declaratory action.

The Florida circuit court reasoned that the Town Charter was equivalent to a municipal constitution, and thus was controlling unless it conflicted with state or federal law. Id. at 11. Accordingly, the court ruled that the Town could not have

---

[2]The district court stated that the Town "adopted" the Fifth Contract Amendment at the February 27, 2002 Town Council meeting. Order at 6 (citing R. 125, at 13). However, the portion of the record cited by the district court states only that the Town Council adopted Resolution 2002-10, and in fact we cannot discern from any part of the record in this case whether the Town and PLPI ever adopted the Fifth Contract Amendment.

10

granted PLPI the right to build over thirty-five feet without violating the Town Charter. It concluded: "At the time of repeal of Ordinance 84-11 and the approval of the [Fifth Contract Amendment], no construction had yet begun on the properties zoned T-1 added to the PUD, and regardless of any vested rights of the PUD, no such estoppel rights attended the added property, and the Town is entitled to declaratory relief that the development proposed by [PLPI] . . . is subject to the 35 foot height limit." Id. at 12.

PLPI never closed on its agreement to purchase Mr. Bochese's property or sought another extension of the closing date. A handwritten note on the second addendum to the sale agreement indicates that PLPI at some point agreed to continue to pay the Bocheses $1200 per month through November, 2002, apparently to keep open the option to purchase. R. 93, Ex. 43. In a November 17, 2002 letter to Mr. Bochese, PLPI explained the reasons the contract did not close: "Unfortunately the delays caused by the pending controversy and litigation between the Town of Ponce Inlet and Ponce Inlet Properties Inc. regarding the issues of the 70 ft. building height and the Preston line will prevent us from closing under our current agreement. It was a shame that the Town rezoned your property back to the T1 classification last February. But for that change in the

11

zoning classification we would have closed on the sale of your property back in March under the previous agreement." R. 44, Ex. B.

During the period of his negotiations with PLPI, Mr. Bochese engaged in certain whistleblowing activities related to the Town's compliance with Federal Emergency Management Agency (FEMA) regulations governing the Town's participation in the National Flood Insurance Program, which enables the Town to obtain flood insurance discounts for its residents by enforcing certain requirements designed to reduce flood risks. To maintain its eligibility for the discounts, the Town had to certify annually to FEMA that it was enforcing those requirements. Mr. Bochese alleges that the Town was falsely certifying its compliance.

Mr. Bochese's whistleblowing centered around alleged misconduct by the Town Attorney, Mr. Doran. On April 18, 2001, Mr. Bochese complained at a Town Council meeting that Mr. Doran's legal fees had greatly exceeded the sums budgeted for them, and that the Town was neglecting its oversight duties. On July 4, 2001, Mr. Bochese filed a code enforcement complaint with the Town, alleging that the Inlet Harbor Restaurant, which was partially owned by Mr. Doran, had been reconstructed in violation of the FEMA regulations and the Town's Land Development Code. Two weeks later, at the July 18, 2001 Town Council meeting, counsel for Mr. Bochese made a presentation arguing that the Town and Mr.

12

Doran had been falsifying official public documents to conceal various FEMA code violations involving the Inlet Harbor Restaurant and other properties. Mr. Bochese provided a letter, an affidavit, and other documents as evidence of the violations.

On September 18, 2001, Mr. Bochese filed a complaint with the Florida Bar against Mr. Doran. The complaint alleged that Mr. Doran's ownership interest in the Inlet Harbor Restaurant and his firm's representation of that restaurant created a conflict of interest that should preclude him from handling the Town's FEMA compliance matters. The Florida Bar investigated and concluded that there was no probable cause to proceed against Mr. Doran.

The Daytona Beach News Journal ran an article focusing on the Town's FEMA problems and on Mr. Doran. Subsequently, the Town Council declared its support for Mr. Doran, enacting Resolution 2001-22, which Mr. Bochese has dubbed the "Terrorism Resolution," since it refers to the Town and Mr. Doran as being "terrorized" by "a propaganda campaign" waged by "greedy litigants." The resolution, adopted December 12, 2001, declares that "the Town Council will no longer sit idly and we are directing the Town Attorney and Town Manager to go on the offensive." R. 112, Ex. 36.

B.

13

On October 23, 2002, Mr. Bochese filed suit against the Town in the United States District Court for the Middle District of Florida under 42 U.S.C. § 1983, claiming that the rescission of the Fourth Contract Amendment and the concomitant rezoning of his lot was retaliation for his whistleblowing activities and violated a number of his constitutional rights. Mr. Bochese alleged violations of his First Amendment free speech, Fourteenth Amendment substantive due process, Fourteenth Amendment procedural due process, Fourteenth Amendment equal protection, and Article I, § 10 contract rights. In addition, he raised a common law claim for negligent supervision and retention of Mr. Doran.

The district court granted summary judgment for the Town on all of Mr. Bochese's claims. Initially, the district court conducted an analysis that, in substance, closely resembled a standing determination, although the court did not frame it in justiciability terms. First, the court found that Mr. Bochese had not suffered any injury as a result of the Town's rescission of the Fourth Contract Amendment, since "his prospects for financial gain under his contingent purchase and sale agreement were speculative at best." Order at 13. The court observed that, "[w]hile the fourth contract amendment purported to grant both the necessary zoning and building height limitation to PLPI, no rights were conferred upon Mr. Bochese because the purchase and sale agreement still gave PLPI 'sole discretion'

14

to decide what approvals were 'necessary' and whether the approvals PLPI obtained were 'acceptable' in terms of the 'manner and design' of construction." Id. (quoting the Purchase and Sale Agreement, R. 93, Ex. 43).

Next, the district court found that even if Mr. Bochese had suffered an injury, its cause was not any action by the Town, but rather PLPI's exercise of its contractual discretion not to exercise its option to purchase the Bochese lot. Id. at 16-17. Finally, the court found that there was no remedy it could provide Mr. Bochese, since even if it reinstated the Fourth Contract Amendment, the Town Charter's 35-foot building height limit would independently bar PLPI from obtaining zoning approval for a 70-foot condominium, which was a condition precedent to its purchase of the Bochese property (and thus to Mr. Bochese's realization of any profit). Id. at 17. Accordingly, the district court concluded that "[b]ecause Mr. Bochese suffered no injury or damages that were caused by the Town's actions, the Town is entitled to summary judgment on all of Mr. Bochese's claims." Id.

In spite of apparently concluding that the plaintiff lacked standing (albeit without ever quite saying that), the district court then proceeded to analyze the merits of Mr. Bochese's claims. Initially, the court concluded that the Town bore no § 1983 liability, because Mr. Bochese had failed to demonstrate either an

15

official Town policy or a pervasive Town practice of unconstitutional retaliation, either of which, the court found, was necessary to establish municipal liability under § 1983. See Order at 18-30. Accordingly, the court granted the Town's motion for summary judgment on Mr. Bochese's § 1983 claims.

The court also proceeded to analyze and reject each of Mr. Bochese's constitutional claims in turn. As to the First Amendment retaliation claim, the court found insufficient evidence that the Town's zoning decision was substantially motivated by Mr. Bochese's whistleblowing activities. Id. at 30-31. On the substantive due process claim, the court concluded that Mr. Bochese had no "fundamental right" in the zoning of his land. Id. at 32-34. As to procedural due process, the court found no deficiency in the procedures by which the Town rescinded the Fourth Contract Amendment. Id. at 35-37. On the equal protection claim, the court determined that Mr. Bochese had failed both to identify any similarly situated individuals who were treated differently than he, and to establish that, if any such disparate treatment had occurred, it was intentional. Id. at 37-39. As to the impairment of contract claim, the court said that the rescission of the Fourth Contract Amendment in no way affected the contractual relationship between Mr. Bochese and PLPI. Id. at 39-40. Finally, the court considered Bochese's common law negligent retention claim, concluding that Florida's

16

sovereign immunity law barred liability for the decision to retain Mr. Doran, which was a discretionary decision of the Town government. Id. at 41-44.

Mr. Bochese now appeals from the district court's grant of final summary judgment for the Town on all of his § 1983 claims. He does not, however, challenge the district court's conclusion as to his common law negligent retention claim.

## II.

### A.

Although the parties have not directly raised the issue, there is a serious and substantial question as to Mr. Bochese's standing to bring this suit, which the district court plainly addressed (without labeling it a jurisdictional matter), and which we must address at the outset. "[S]tanding is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." Dillard v. Baldwin County Comm'rs, 225 F.3d 1271, 1275 (11th Cir. 2000) (citing Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 102, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998); Florida Ass'n of Med. Equip. Dealers v. Apfel, 194 F.3d 1227, 1230 (11th Cir. 1999); and EF Hutton & Co., Inc. v. Hadley, 901 F.2d 979, 983 (11th Cir. 1990)).

In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1223 (11th Cir. 2004) (quoting Warth v. Seldin, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975)). "It is by now axiomatic that the inferior federal courts are courts of limited jurisdiction. They are 'empowered to hear only those cases within the judicial power of the United States as defined by Article III of the Constitution' . . . ." Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 409 (11th Cir. 1999) (quoting Taylor v. Appleton, 30 F.3d 1365, 1367 (11th Cir. 1994)). Standing is a doctrine that "stems directly from Article III's 'case or controversy' requirement," and thus it "implicates our subject matter jurisdiction." Nat'l Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1242 (11th Cir. 2003) (citing Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000)). In fact, standing is "perhaps the most important" jurisdictional doctrine, Bischoff v. Osecola County, 222 F.3d 874, 877-78 (11th Cir. 2000) (quoting United States v. Hays, 515 U.S. 737, 742, 115 S. Ct. 2431, 132 L. Ed. 2d 635 (1995) (quoting FW/PBS, Inc. v. Dallas, 493 U.S. 215, 230-31, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990))), and, as with any

18

jurisdictional requisite, we are powerless to hear a case when it is lacking. "Simply put, once a federal court determines that it is without subject matter jurisdiction, the court is powerless to continue." Univ. of S. Ala., 168 F.3d at 410.

"A necessary corollary to the concept that a federal court is powerless to act without jurisdiction is the equally unremarkable principle that a court should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings. Indeed, it is well settled that a federal court is obligated to inquire into subject matter jurisdiction sua sponte whenever it may be lacking." Id. An appellate court "must satisfy itself not only of its own jurisdiction, but also of that of the lower courts in a cause under review." Id. (quoting Mitchell v. Maurer, 293 U.S. 237, 244, 55 S. Ct. 162, 79 L. Ed. 338 (1934)). Because this requirement "involves the court's competency to consider a given type of case," it "cannot be waived or otherwise conferred upon the court by the parties." Id. (quoting Jackson v. Seaboard Coast Line R.R., 678 F.2d 992, 1000-01 (11th Cir. 1982)). Accordingly, we are obliged to consider questions of standing regardless of whether the parties have raised them. See, e.g., Hays, 515 U.S. at 742; Dillard, 225 F.3d at 1275; Cuban Am. Bar Ass'n, Inc. v. Christopher, 43 F.3d 1412, 1422 (11th Cir. 1995) ("Before rendering a decision . . . every federal court operates under an independent obligation to ensure it is presented with the kind of concrete

19

controversy upon which its constitutional grant of authority is based; and this obligation on the court to examine its own jurisdiction continues at each stage of the proceedings, even if no party raises the jurisdictional issue and both parties are prepared to concede it." (quoting Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale, 922 F.2d 756, 759 (11th Cir. 1991))).

Accordingly, we begin by considering whether Mr. Bochese has constitutional standing to raise the claim he has brought here. Because we conclude that he does not, our inquiry ends with standing as well.

### B.

We review a summary judgment ruling de novo, viewing the materials presented and drawing all factual inferences in a light most favorable to the non-moving party. Nat'l Parks Conservation Ass'n, 324 F.3d at 1236. Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the burden of demonstrating the satisfaction of this standard, by presenting "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" that establish the absence of any genuine, material factual dispute. Id.

We review standing determinations de novo. Dillard, 225 F.3d at 1275 (citing Eng'g Contractors Ass'n of S. Fla., Inc. v. Metro. Dade County, 122 F.3d 895, 903 (11th Cir. 1997)). "[E]ach element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" Florida Public Interest Research Group v. EPA, 386 F.3d 1070, 1083 (11th Cir. 2004) (quoting Bischoff, 222 F.3d at 878 (internal quotation marks omitted) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992))). Accordingly, when a question about standing is raised at the motion to dismiss stage, "it may be sufficient to provide 'general factual allegations of injury resulting from the defendant's conduct.'" Id. (quoting Bischoff, 222 F.3d at 878). In contrast, when, as here, standing is raised at the summary judgment stage, "the plaintiff can no longer rest on 'mere allegations.'" Id. (quoting Bischoff, 222 F.3d at 878 (internal quotation marks omitted) (quoting Defenders of Wildlife, 504 U.S. at 561)).

However, what precisely the plaintiff must prove depends on the nature of the challenge to his or her standing. As with any summary judgment determination, we look beyond the complaint, to the "depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," Fed.

21

R. Civ. P. 56(c), in considering a "factual challenge" to standing. See, e.g., Nat'l Parks Conservation Ass'n, 324 F.3d at 1242. However, in making the necessary preliminary determination of what claims the plaintiff has actually raised (and therefore, what claims he must have standing to raise), we are bound by the contents of the plaintiff's pleadings, even on summary judgment. "Facial attacks" on the complaint "require[] the court merely to look and see if [the] plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true." Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990) (alterations in original) (quoting Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir. 1980)) (internal quotation marks omitted).[3]

As the Supreme Court has explained, "[o]ne element of the case-or-controversy requirement is that appellees, based on their complaint, must establish that they have standing to sue." Raines v. Byrd, 521 U.S. 811, 818, 117 S. Ct. 2312, 138 L. Ed. 2d 849 (1997) (emphasis added); see also Focus on the Family v. Pinellas Suncoast Transit Authority, 344 F.3d 1263, 1275 (11th Cir. 2003) ("Article III standing must be determined as of the time at which the plaintiff's complaint is filed."). "Typically, . . . the standing inquiry requires

---

[3]The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

22

careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." Allen v. Wright, 468 U.S. 737, 752, 104 S. Ct. 3315, 82 L. Ed. 2d 556 (1984). "Although standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted." Warth, 422 U.S. at 500 (citation omitted).

It is not enough that "the [plaintiff]'s complaint sets forth facts from which we could imagine an injury sufficient to satisfy Article III's standing requirements," since "we should not speculate concerning the existence of standing, nor should we imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none. The plaintiff has the burden to 'clearly and specifically set forth facts sufficient to satisfy [] Art. III standing requirements.' If the plaintiff fails to meet its burden, this court lacks the power to create jurisdiction by embellishing a deficient allegation of injury." Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n, 226 F.3d 1226, 1229-30 (11th Cir. 2000) (emphasis added) (third alteration in original) (citations omitted) (quoting Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990)); see also, e.g., Warth, 422 U.S. at 518 ("It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to

23

invoke judicial resolution of the dispute and the exercise of the court's remedial powers."); Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001); Cone Corp. v. Fla. Dep't of Transp., 921 F.2d 1190, 1210 (11th Cir. 1991)); Anderson v. City of Alpharetta, 770 F.2d 1575, 1582 (11th Cir. 1985). We therefore turn to Mr. Bochese's complaint[4] to determine whether he has raised a claim on which he is entitled to adjudication by this Court.

The task of discerning precisely what claims Mr. Bochsese has raised is complicated because Mr. Bochese has been something of a moving target, periodically recasting his arguments, throughout this litigation. Nevertheless, after careful review of Mr. Bochese's complaint, we understand him to be alleging that the Town's February 27, 2002 rescission of the Fourth Contract Amendment to its Development Agreement with PLPI, which resulted in the removal of the Bochese lot from PLPI's PUD and restoration of its original T-1 zoning classification, injured Mr. Bochese by sabotaging his potentially very profitable prospect of selling the land to PLPI. The content of Mr. Bochese's complaint reveals that this challenge to the Town's February 27, 2002 rescission of the Fourth Contract Amendment is the only claim he has raised. We can find nothing in Mr. Bochese's

---

[4]References to the "complaint" are to Mr. Bochese's amended complaint, filed July 3, 2003 (R. 44).

24

complaint to suggest that he has challenged the Town's April 18, 2001 adoption of Ordinance 2001-08, which eliminated the previously existing exemptions from the Town's 35-foot building height restriction for T-1 and PUD property; the Town's readoption of its charter, effective December 1, 2001, to reflect this across-the-board application of the 35-foot building height limit; or any other action by the Town.

Subsequent to the filing of his complaint, Mr. Bochese attempted several times to recast his claims more broadly, as challenges to the Town's application of its 35-foot building height restriction to his property. The chronological development of Mr. Bochese's arguments is as follows. Mr. Bochese filed his initial complaint in this case on October 23, 2002. R. 1. On February 7, 2003, Mr. Bochese filed a motion to amend his complaint, which the Town opposed. R. 16. The district court, in its Case Management and Scheduling Order of April 17, 2003, set a deadline of May 5, 2003, for amending pleadings. R. 24. Nevertheless, the court granted Mr. Bochese leave to amend his complaint on May 29, 2003. R. 39. On July 3, 2003, Mr. Bochese filed an amended complaint, which raised additional state law claims and a common law negligent retention and supervision claim. R. 44. On November 3, 2003, Mr. Bochese again moved for leave to amend -- this time, to amend the amended complaint of July 3, 2003 --

which the Town opposed.  R. 87.  Notably, the district court denied this motion on December 2, 2003, citing the May 5, 2003 deadline for amending pleadings.  R. 122.

Mr. Bochese apparently sought to amend his complaint a second time to include, among other things, the allegation that the Town improperly applied its 35-foot building height restriction to his property.  See R. 87, at 2-3.[5]  His November 3, 2003 motion to amend explained that depositions of PLPI

---

[5]Mr. Bochese's motion to amend the amended complaint stated that a copy of the proposed second amended complaint was appended to the motion; however, the record in this case contains no such copy, reflecting only that the motion -- without any attachment -- was filed with the district court.  Nevertheless, Mr. Bochese included in the record excerpts he filed with this Court a copy of what apparently is the revised complaint he wished to file with the district court.  The document, entitled "Civil Action by Second Amended Verified Complaint for Deprivation of Civil Rights, Negligent Supervision and Retention and Takings Claim Under Bert J. Harris Damages and Injunctive Relief Sought and Demand for Jury Trial," and referred to in the index to Mr. Bochese's record excerpts simply as "Second Amended Verified Complaint w/ Attached Exhibits (R. 87)," bears no stamp indicating it was ever filed with the district court, and is not contained in the record.  Nevertheless, Mr. Bochese submitted the document to this Court, apparently as if it were somehow part of the record in this case, without in any manner indicating that the district court had, in fact, denied his motion to file a second amended complaint.  In fact, Mr. Bochese labeled this document "R. 87," in spite of the fact that record entry 87 consists only of his motion to amend the complaint a second time, and does not include the proposed complaint itself.

Litigants should need no reminding that the contents of the record are firmly fixed, and not subject to interpretation.  Federal Rule of Appellate Procedure 10 makes clear that "[t]he following items constitute the record on appeal: (1) the original papers and exhibits filed in the district court; (2) the transcript of proceedings, if any; and (3) a certified copy of the docket entries prepared by the district clerk."  Fed. R. App. P. 10(a) (emphasis added).  Eleventh Circuit Rule 30-1 further provides that the appellant must file "copies of the following portions, and only the following portions, of the district court or tax court record . . . ."  11th Cir. R. 30-1 (emphasis added).  These rules leave no room for litigants to file purely aspirational pleadings -- particularly when masked as actual pleadings -- with this Court.

26

representatives had "revealed that the TOWN, on February 27, 2002, in addition to unlawfully down-zoning BOCHESE'S property, had also applied to his property an invalid zoning regulation," and that "[i]t was just discovered that in 1983 the TOWN had improperly adopted a zoning ordinance proposing a charter amendment limiting building heights to 35 ft. since the TOWN did not comply with specific notice requirements in violation of Florida law." R. 87, at 2. Mr. Bochese made arguments along these lines in his summary judgment brief to the district court, see, e.g., R. 110, at 16-18, in his brief to this Court, see Appellant's Br. at 23-24, 43, and in oral argument before this Court, as well. However, the district court denied Mr. Bochese's motion for leave to amend his complaint to raise these claims, and Mr. Bochese did not appeal from that denial. Accordingly, we are barred from considering these claims, which were never actually raised, in evaluating whether Mr. Bochese has standing.

Mr. Bochese's complaint of July 3, 2003 (the amended complaint) is his operative pleading and, as such, the complaint to which we look in making our standing determination. Imprecise as that document is, it contains no challenge to Town Ordinance 2001-08, to the readopted December 1, 2001, Town Charter, or to any other Town limitation on building height. Our thorough review of the complaint compels us to conclude that it can be fairly read only as challenging the

rescission of the Fourth Contract Amendment to the Development Agreement between the Town and PLPI. The complaint repeatedly attributes Mr. Bochese's claimed injuries to the Town's rescission of the Fourth Contract Amendment. The failure of the Fourth Contract Amendment to the Development Agreement between PLPI and the Town, Mr. Bochese says, prompted PLPI to decide not to close on a land sale deal with Mr. Bochese, depriving him of $950,000 in potential profits.

Specifically, the complaint alleges that, in anticipation of earning $950,000 from selling his land to PLPI for use in their PUD, Mr. Bochese purchased another lot and arranged for the construction of a new home on it. See R. 44, ¶ 11("In reliance on the TOWN's legislative act of re-zoning his property to PUD [in April 2001] and their subsequent representations that the more favorable and flexible PUD zoning regulations and uses would be applied to his property, on August 3, 2001, BOCHESE entered into a $950,000 contract with [PLPI] for the sale of his property. Moreover, in further reliance of [sic] the same, BOCHESE purchased another building lot for the purposes of constructing another residence and expended significant time and money in generating the building plans for the new home site. Additionally, BOCHESE entered into a contract with a builder for the construction of his new home.").

28

However, Mr. Bochese's plan to sell his land was thwarted when PLPI decided not to buy it, a development Mr. Bochese repeatedly attributes to the "down-zoning" of his land from PUD to T-1 status because the Town rescinded the Fourth Contract Amendment. See, e.g., R. 44, ¶ 29 ("[Resolution 2002-10, which approved the rescission of the Fourth Contract Amendment,] unnecessarily and without any logical relationship to its stated purpose or rational justification rezoned BOCHESE's property. . . . [The resolution] down-zoned or spot-zoned BOCHESE's property from PUD to T-1. As such, the TOWN reneged on the previous legislation and agreement thereby restricting the use of his property, effectively killing BOCHESE's $950,000 deal."); R. 44, ¶ 31 ("But for the down zoning-spot zoning of BOCHESE's property, [PLPI] has expressly stated that they would have purchased his property in March 2002 under their contract. Because of the change in zoning, construction consistent with the PUD could not occur due to the TOWN's application of the T1 classification to the rezoned property." (citation omitted)); R. 44, ¶ 39(b) ("The TOWN, in February 2002, singled out BOCHESE's property compared to other similarly situated properties that surrounded him and down-zoned or spot zoned his property from PUD to T1 less then [sic] a year after it had been rezoned by the TOWN from T1 to PUD. The zoning change has caused the impairment of his contractual relationship with the

29

PUD developer and has resulted in unreasonable and arbitrary interference with his fundamental possessory interests in his property."); R. 44, ¶ 39(e) ("The Town adopted and applied on February 27, 2002, a specific procedure to rezone BOCHESE's property that was intended to and did preclude giving him adequate notice and a meaningful opportunity to be heard.").

Moreover, insofar as Mr. Bochese's complaint identifies with any particularity the basis for his various constitutional claims, it consistently cites the removal of his property from PLPI's PUD, again, pursuant to the Town's rescission of the Fourth Contract Amendment, as the source of his injuries. See, e.g., R. 44, ¶¶ 43(e) (identifying the down-zoning from PUD to T-1 zoning as the source of the alleged substantive due process violation); 43(f) (identifying the down-zoning as the source of the alleged equal protection violation); 43(g) (identifying the down-zoning as the source of the alleged procedural due process violation).

As to damages, Mr. Bochese seeks, in addition to monetary damages "including the diminution in value to his property or the loss of the profit from the $950,000 dollar contract," R. 44, ¶ 45, injunctive relief barring the Town "from applying the T1 restrictions that are inconsistent with the PUD to [Bochese's] property as well as [from] changing the zoning classification of his property from

30

PUD to T1 on the TOWN's future land use map." R. 44, ¶ 47. This single mention of diminution in property value in Bochese's monetary damages claim is open-ended and could theoretically be construed as a claim for the reduction in value as a result of the application of the 35-foot rule; however, we cannot fairly read it that way for several reasons. For one thing, at no point in the complaint or even subsequent to its filing does Mr. Bochese in any way elaborate on this isolated reference to diminished property value, let alone attribute it to the height restriction. Moreover, Mr. Bochese's complaint strongly says that he believes any economic loss he has suffered resulted from the removal of his property from PLPI's PUD and consequent "down-zoning" to T-1 status. In fact, he repeatedly quantifies his loss as $950,000, precisely the potential value of his contract with PLPI. Finally, his plea for injunctive relief -- seeking to bar the Town from down-zoning his land from T-1 to PUD -- makes plain that Mr. Bochese is challenging the rescission of the Fourth Contract Amendment, not the Town's 35-foot building height restriction. R. 44, ¶ 47.

At no point in the complaint does Mr. Bochese assert that he is challenging or that he has been injured in any way by the Town's April 18, 2001 adoption of Ordinance 2001-08, implementing an across-the-board 35-foot building height limit; by the Town's readoption of its charter, effective December 1, 2001, to

reflect this height restriction; or by <u>any</u> action of the Town other than its rescission of the Fourth Contract Amendment on February 27, 2002. Based on the allegations that are contained in Mr. Bochese's complaint, we conclude that all he has challenged here is the Town's rescission of the Fourth Contract Amendment to its Development Agreement with PLPI. We analyze his standing accordingly.

C.

It is by now well established that, "[t]o satisfy the constitutional requirements of standing, a plaintiff must make three showings: First, the plaintiff must have suffered an 'injury in fact' -- an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."' Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court.' Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" <u>Dillard</u>, 225 F.3d at 1275 (quoting <u>Defenders of Wildlife</u>, 504 U.S. at 560-61 (alterations in original) (internal citations and footnote omitted)); <u>see also</u> <u>Nat'l Parks Conservation Ass'n</u>, 324 F.3d at 1241; <u>Bischoff</u>, 222 F.3d at 883.

32

Mr. Bochese has failed in two regards to establish that he has suffered an injury in fact: he has neither shown a legally protected interest of his that the Town has invaded, nor demonstrated an injury that is actual and imminent, rather than speculative and hypothetical. Because we conclude that Mr. Bochese has failed to establish an injury in fact, we need not and do not consider whether the remaining elements of standing are present.

1.

It is by now abundantly clear that to establish an injury in fact, Mr. Bochese must first demonstrate that the Town has invaded some "legally protected interest" of his. Dillard, 225 F.3d at 1275 (quoting Defenders of Wildlife, 504 U.S. at 560). "No legally cognizable injury arises unless an interest is protected by statute or otherwise." Cox Cable Communications, Inc. v. United States, 992 F.2d 1178, 1182 (11th Cir. 1993). That "interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right." Vt. Agency of Natural Res., 529 U.S. at 772.

Mr. Bochese claims to have an interest protected by contract. Although he has characterized his claim as arising under § 1983, Mr. Bochese is, in substance, suing to enforce a contract to which he is not a party, namely the Fourth Contract Amendment to the Development Agreement between the Town of Ponce Inlet and

PLPI, dated May 21, 2001. As we have explained in some detail, he argues that the Town's wrongful and unlawful rescission of that contract constituted an invasion of his legally protected interest therein, and seeks damages and injunctive relief.

The trouble with this claim is that Mr. Bochese has not established that he has any legally cognizable interest in the subject matter of the Fourth Contract Amendment. The focus of the standing inquiry is "whether the plaintiff is the proper party to bring this suit." Raines, 521 U.S. at 818. It is undisputed that Mr. Bochese was not a party to the Fourth Contract Amendment, which was entered into and signed by the Town's mayor and PLPI's executive vice-president, Richard Friedman, only. As a non-party, to sue to enforce the contract, Mr. Bochese can only establish standing if he was an intended third-party beneficiary of the rescinded agreement.

The question of whether, for standing purposes, a non-party to a contract has a legally enforceable right therein is a matter of state law. See, e.g., Miree v. DeKalb County, 433 U.S. 25, 29-33, 97 S. Ct. 2490, 53 L. Ed. 2d 557 (1977) (holding that, even when the United States was a party to the contracts at issue, "whether petitioners as third-party beneficiaries of the contracts have standing to sue" was a question of state law, not of federal common law); Castro Convertible

34

Corp. v. Castro, 596 F.2d 123, 124 (5th Cir. 1979) (observing that whether "a third-party beneficiary contract is a real party in interest, who, like the ultimate beneficiary, has standing to maintain a suit for breach of contract" is a "state contract law question"); see also Perry v. Sindermann, 408 U.S. 593, 602 n.7, 92 S. Ct. 2694, 33 L. Ed. 2d 570 (1972) (observing that the question of whether an employment contract endows a plaintiff with a legally enforceable property right is properly answered by reference to state contract law); Osman v. Hialeah Hous. Auth., 785 F.2d 1550, 1550 (11th Cir. 1986) (observing that whether a plaintiff has a constitutionally protected property interest in an employment contract is a question of state law).

Applying the law of Florida, we conclude that Mr. Bochese was not an intended beneficiary of the Fourth Contract Amendment, and therefore has no legal right to challenge its rescission.

"Florida courts have recognized three types of third party beneficiaries to a contract: (1) donee beneficiaries; (2) creditor beneficiaries; and (3) incidental beneficiaries." Int'l Erectors, Inc. v. Wilhoit Steel Erectors & Rental Serv., 400 F.2d 465, 471 (5th Cir. 1968) (citation and internal quotation marks omitted). The key distinction is that the first two categories are classes of "intended" beneficiaries, who have a right to sue for enforcement of the contract, whereas the

35

third category, "third party beneficiaries recognized as incidental beneficiaries[,] have no enforceable rights under a contract." Id. (citation and internal quotation marks omitted). The intent of the parties is the key to determining whether a third party is an intended (i.e., donee or creditor) or only an incidental beneficiary. See, e.g., Marianna Lime Prods. Co. v. McKay, 147 So. 264, 265 (Fla. 1933) ("[T]he test is[] not that the promisee is liable to the third person, or that there is some privity between them or that some consideration moved from the third person, but that the parties to the contract intended that a third person should be benefitted by the contract.").

Under Florida law, a third party is an intended beneficiary of a contract between two other parties only if a direct and primary object of the contracting parties was to confer a benefit on the third party. If the contracting parties had no such purpose in mind, any benefit from the contract reaped by the third party is merely "incidental," and the third party has no legally enforceable right in the subject matter of the contract. See, e.g., Thompson v. Commercial Union Ins. Co. of N.Y., 250 So. 2d 259, 262 (Fla. 1971) ("Essential to the right of a third party beneficiary of a contract to maintain an action for its breach is the clear intent and purpose of the contract to directly and substantially benefit the third party."); Vencor Hosps. v. Blue Cross Blue Shield of R.I., 169 F.3d 677, 680 (11th Cir.

36

1999) ("A party has a cause of action as a third-party beneficiary to a contract if the contracting parties express an intent primarily and directly to benefit that third party (or a class of persons to which that third party belongs)."); Blu-J, Inc. v. Kemper C.P.A. Group, 916 F.2d 637, 640 (11th Cir. 1990) ("In order for one to qualify as a third party beneficiary under a contract, it must be shown that the intent and purpose of the contracting parties was to confer a direct and substantial benefit upon the third party.  In the absence of a clear intent to benefit the third person, he cannot sue on the contract. Where the contract is designed solely for the benefit of the formal parties thereto, a third person cannot maintain an action thereon, even though such third person might derive some incidental or consequential benefit from its enforcement." (quoting Florida ex rel. Westinghouse Elec. Supply Co. v. Wesley Constr. Co., 316 F. Supp. 490, 495 (S.D.Fla.1970), aff'd, 453 F.2d 1366 (5th Cir. 1972) (citing Am. Sur. Co. of New York v. Smith, 100 Fla. 1012, 130 So. 440 (1930)))); Int'l Erectors, 400 F.2d at 472 ("The Florida courts require that there must have been an intent to benefit the third party at the time the promisor and promisee entered into the contract in order for the third party to be classified as either a donee or a creditor beneficiary.  If no such intention to benefit is found in the contract, the third party is an incidental

beneficiary and has no rights enforceable against the promisor under the contract."

(citations omitted)).

Accordingly, the question in this case is whether PLPI and the Town

entered into the Fourth Contract Amendment for the direct and substantial purpose

of conferring a benefit on Mr. Bochese.  The Florida Supreme Court has explained

that "[t]he question whether a contract was intended for the benefit of a third

person is generally regarded as one of construction of the contract.  The intention

of the parties in this respect is determined by the terms of the contract as a whole,

construed in the light of the circumstances under which it was made and the

apparent purpose that the parties are trying to accomplish." A.R. Moyer, Inc. v.

Graham, 285 So. 2d 397, 402 (Fla. 1973) (quoting 17 Am. Jur. 2d, Contracts § 304

(1964)).  The contracting parties' intent to benefit the third party must be specific

and must be clearly expressed in the contract in order to endow the third party

beneficiary with a legally enforceable right.  See, e.g., Am. Sur. Co., 130 So. at

441 ("Where, therefore, it is manifest from the nature or terms of a contract that

the formal parties thereto intended its provisions to be for the benefit of a third

party, as well as for the benefit of the formal parties themselves, the benefit to

such third party being the direct and primary object of the contract, or amongst

such objects, such third party may maintain an action on the contract even though

38

he be a stranger to the consideration."); <u>Morgan Stanley DW, Inc. v. Halliday</u>, 873

So. 2d 400, 403 (Fla. 4th DCA 2004) ("A non-party is the specifically intended

beneficiary only if the contract clearly expresses an intent to primarily and directly

benefit the third party or a class of persons to which that party belongs. To find

the requisite intent, it must be established that the parties to the contract actually

and expressly intended to benefit the third party; it is not sufficient to show only

that one of the contracting parties unilaterally intended some benefit to the third

party." (citations omitted)); <u>Int'l Erectors</u>, 400 F.2d at 472 ("[W]here the nature or

terms of a contract reveal the intention of the formal parties thereto that its

provisions be not merely for their own benefit but also for the benefit of a third

party, the benefit to that third party being one of the direct and primary objects of

the contract, such a third party action may be maintained.").

The mere fact that Mr. Bochese's land was incorporated into PLPI's PUD

pursuant to the Fourth Contract Amendment, without any expression of an intent

to confer a benefit on Mr. Bochese, is wholly insufficient to establish that he was

an intended beneficiary of the agreement.[6] Nothing in the record suggests that

---

[6]Indeed, we have some doubt as to whether the incorporation of Mr. Bochese's land into the PUD was even valid in the first place. The Town Land Development Code makes clear that all land within a PUD must be under unified ownership. The record reflects that PLPI secured authorization for inclusion of the Bochese lot in its PUD by inaccurately representing that it owned the plot. Accordingly, Mr. Bochese's land appears never to have been validly integrated into the PUD at all, separately defeating his claimed interest in the subject matter of the Fourth

PLPI was motivated by anything other than its own financial gain in contracting with the Town or that the Town had any desire to reach an arrangement beneficial to Mr. Bochese. In fact, the Fourth Contract Amendment, as well as the original Development Agreement governing the PUD, make clear that the Town and PLPI are the only parties with any degree of control over the PUD. The PUD zoning, even of Mr. Bochese's lot was granted specifically to PLPI. See R. 93, Ex. 37, ¶ 12 (referring to "the Developer's vested rights to construct seventy foot (70') buildings on [the PUD] lots").

Moreover, the Fourth Contract Amendment contains not a single reference to Mr. Bochese, nor does it even mention with particularity his plot of land. The only allusion thereto is the provision that "[t]he four lots north of the Beach Club now described on Exhibit 'E-7-00' zoned 'T-1' Tourist Accommodations" -- one of which plots is presumably Mr. Bochese's -- "will be rezoned to Planned Unit Development (PUD) with the current subdivision lot lines being vacated." R. 93, Ex. 37, ¶ 12.

In the absence of any specific mention of Mr. Bochese in the contract, it would be extraordinarily difficult for him to establish that under Florida law he

Contract Amendment. In fact, this was one of the Town's stated reasons for rescinding the Fourth Contract Amendment.

was an <u>intended</u> beneficiary, since "[a]n intent to benefit a third party which must be inferred from contradicted circumstantial evidence cannot be characterized as 'apparent,' 'direct,' or 'primary.'" <u>Hewko v. Genovese</u>, 739 So.2d 1189, 1192 (Fla. 4th DCA 1999). In this case, there is simply <u>no</u> evidence -- textual, circumstantial, extrinsic, or otherwise -- that even one of the contracting parties (let alone both PLPI and the Town) intended to confer a benefit on Mr. Bochese. Thus, it cannot be said that the contracting parties clearly expressed a direct or primary intent to benefit Mr. Bochese.

Because Mr. Bochese was not an intended beneficiary of the Fourth Contract Amendment between the Town and PLPI, he had no "legally cognizable interest" in that agreement and therefore lacks standing to challenge its rescission. Again, it is well settled that a "plaintiff generally must assert his <u>own</u> legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." <u>Warth</u>, 422 U.S. at 499 (emphasis added); <u>Miccosukee</u>, 226 F.3d at 1230 ("Absent exceptional circumstances, a third party does not have standing to challenge injury to another party."). As the Supreme Court has explained, "[t]he Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even though the court's judgment may benefit others collaterally. A federal court's jurisdiction therefore can be invoked only when the

41

plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action . . . .'" Warth, 422 U.S. at 499 (quoting Linda R.S. v. Richard D., 410 U.S. 614, 617, 93 S. Ct. 1146, 35 L. Ed. 2d 536 (1973)). Because Mr. Bochese was neither a party to nor an intended beneficiary of the Fourth Contract Amendment, he has not himself suffered a legally cognizable injury as a result of its rescission; thus, even though he might benefit collaterally from the reinstatement of that agreement, he lacks standing to bring this challenge.

2.

Mr. Bochese has also failed to establish that any harm he suffered was "actual or imminent, not 'conjectural' or 'hypothetical,'" Defenders of Wildlife, 504 U.S. at 560, and thus he has failed in a second respect to establish an injury in fact. "[T]o satisfy the injury prong of Article III standing, a plaintiff must 'present "specific, concrete facts" showing that the challenged conduct will result in a "demonstrable, particularized injury" to the plaintiff.'" Miccosukee, 226 F.3d at 1229 (quoting Cone Corp., 921 F.2d at 1204 (quoting Warth, 422 U.S. at 508)).

The specific harm Mr. Bochese claims to have suffered as a result of the Town's rescission of the Fourth Contract Amendment is the loss of $950,000 in profits he expected to earn from selling his land to PLPI. This alleged injury, however, amounts to no more than conjecture. The record clearly reflects that Mr.

42

Bochese's realization of any profit was highly uncertain, since PLPI was under no obligation to purchase his land. The purchase agreement between Mr. Bochese and PLPI in fact amounted only to a sort of option agreement, giving PLPI substantial discretion not to purchase the Bochese lot. An addendum to the agreement provided that purchase was "subject to [PLPI] obtaining the necessary approvals from the Town of Ponce Inlet, Florida for the construction of a 70 foot high condominium in a manner and design acceptable to [PLPI] at [PLPI's] sole discretion," and if PLPI did not obtain such approvals by the scheduled closing date, it would "have the option to close pursuant to the terms of the contract or terminate this Contract at its sole discretion." R. 93, Ex. 43 (emphasis added). Moreover, the agreement provided that PLPI's prior or simultaneous purchase of the DiFranco lot was "a condition precedent to [PLPI]'s obligation to close" on the Bochese deal. R. 93, Ex. 43.

The $950,000 Mr. Bochese hoped to earn from selling his land to PLPI was aspirational. Quite simply, he had no way of knowing, let alone proving, (1) whether the Town would approve the construction of a condominium complex at all; (2) if the Town approved any such construction, whether the Town would allow the complex to reach a height of 70 feet; (3) whether the approval would come in a "manner" acceptable to PLPI, at PLPI's "sole discretion"; (4) whether

43

the approved "design" would be acceptable to PLPI, at PLPI's "sole discretion"; (5) whether the necessary approvals, if obtained at all, would come by the scheduled closing date (and, if not, whether PLPI would elect to terminate or to close on the land sale); (6) whether PLPI would decide to purchase the DiFranco lot; and (7) whether the DiFrancos would decide to sell their lot to PLPI. Moreover, whether these conditions would ever be satisfied was utterly dependent on the discretion of the Town, PLPI, and the DiFrancos. Mr. Bochese had no way of compelling the DiFrancos to sell their land, of compelling the Town to grant PLPI the requisite approvals or, if those were forthcoming, of compelling PLPI to exercise its "sole discretion" to close on the deal with him. The discretion reserved to PLPI under its purchase agreement with Mr. Bochese was simply so broad as to render PLPI's eventual purchase of the Bochese lot no more than a wholly uncertain possibility.

A series of substantial variables, over which Mr. Bochese himself had utterly no control, stood between Mr. Bochese and the $950,000 he hoped to earn. Mr. Bochese's alleged "loss" of $950,000 therefore does not rise to the level of certainty required to establish an injury in fact. We simply cannot conclude that the loss of a hypothetical and uncertain prospect of earning a sum of money amounts to an "actual" or "imminent" injury. Thus, Mr. Bochese has

44

demonstrated no injury adequate to establish standing to challenge the Town's rescission of the Fourth Contract Amendment.

Because Mr. Bochese has demonstrated neither a legally protected interest nor an actual or imminent injury, he has failed to establish an injury in fact, and is therefore without constitutional standing.

### III.

Measuring Mr. Bochese's standing, as we must, against the claims he actually raised in his complaint, we conclude that he is without standing to bring this suit, and we are without the judicial power to entertain it. Mr. Bochese's complaint challenged only the rescission of the Fourth Contract Amendment between the Town and PLPI, which caused him no injury in fact. Therefore, we have no jurisdiction, nor did the district court, to examine the merits of his claims. Insofar as the district court entered summary judgement for lack of standing, we AFFIRM on that basis.

AFFIRMED.

EDMONDSON, Chief Judge, concurs in the result.